**STAND BUYS, LTD. CORPORATION, a Michigan corporation, Plaintiff,**

v.

**MICHIGAN BELL TELEPHONE COMPANY, a Michigan corporation, and American Telephone and Telegraph, a foreign corporation, Defendants.**

Civ. A. No. 84–5013.

United States District Court, E.D. Michigan, S.D.

May 23, 1986.

John A. Rumenapp, Birmingham, Mich., for plaintiff.

Michael A. Holmes, Detroit, Mich., for Michigan Bell.

Peter J. Durand, Detroit, Mich., for American Telephone.

## MEMORANDUM OPINION

SUHRHEINRICH, District Judge.

Plaintiff, Stand Buys, Ltd., brought this civil action against defendants alleging

breach of contract, misrepresentation, negligence, slander, and intentional interference with a contractual relationship relating to telephone number changes, installation dates, delays, and interruptions in service and repairs arising out of the installation and maintenance of an interstate telephone service. Defendants removed the action to this court pursuant to 28 U.S.C. § 1391 and § 1441. Michigan Bell counterclaimed to recover the amounts owed by Stand Buys for services rendered but not paid for. This action is now before the Court on a motion by defendants to dismiss plaintiff's complaint for failure to state a claim upon which relief can be granted or, in the alternative, for summary judgment.

Plaintiff's complaint arises out of the following facts. Plaintiff, Stand Buys, is a clearing house for discounted travel. Members who pay an annual $45.00 membership fee can secure various travel arrangements on a discounted basis from Stand Buys through a telephone hotline number. A toll-free hotline telephone number is provided for those members who live outside of the local telephone area code. Band V WATS numbers are provided to members living outside the State of Michigan. Michigan WATS line numbers are provided for members who reside within Michigan but outside of the local area code. To eliminate non-member usage, Stand Buys would have defendants change the hotline numbers or install new WATS lines approximately every six months.

On January 18, 1984, Stand Buy's representative, Executone-Tate Communications Corporation (Executone) placed an order for a new Band V WATS line and numbers, and new Michigan WATS and local line numbers. A February 22, 1984 installation date was set, while the old lines were to be disconnected on March 2, 1984.

The new Michigan WATS and local line numbers were installed by mid-February. However, Stand Buys was notified by the Executone representatives that there would be a delay in the Band V WATS hotline installation. On March 1, 1984, all Band V WATS lines were disconnected although Stand Buys had cancelled the disconnection order. The lines were reconnected the next day. Later in March, the Band V WATS hotlines were again disconnected, but reinstated the same day. The new Band V WATS lines were installed, and the new phone numbers confirmed on March 19, 1984.

From April 3, 1984 to April 7, 1984, the Band V WATS lines were again disconnected. During those 72 hours, defendants placed a recorded message which told callers that the line was disconnected. Members could call the Band V WATS reservations number or other Stand Buys' numbers to obtain hotline information to find out why the hotline phone number was disconnected. Once the Band V WATS number was replaced on April 7, 1984, the old hotline number could not be used. Members calling the old hotline number were informed of the new hotline number. This recorded message was removed on May 18, 1984, and thereafter, only members with the current hotline numbers could receive hotline information.

Also, on August 6, 1984, members calling a Michigan WATS reservation number were connected to an IBM office instead. This problem was corrected at 10:20 a.m. on August 7, 1984 after numerous calls by plaintiff to defendant.

AT & T Tariff FCC No. 259 is the law regarding claims for damages associated with the provision of interstate telephone service. The tariff limits defendants' liability to Stand Buys as follows:

(B) The Telephone Company's liability, if any, for its willful misconduct is not limited by this tariff. With respect to any other claim or suit, by a Customer or by any others, for damages associated with the installation, provision, termination, maintenance, repair, or restoration of service, and subject to the provisions of (C) through (E) following, the Telephone Company's liability, if any, shall not exceed an amount equal to the monthly recurring charge for the 800 Service, 800 Service-Canada or Outward WATS access line, whichever is appropriate. This

liability shall be in addition to any amounts that may otherwise be due to the Customer under this tariff as an allowance for interruptions. Tariff F.C.C. No. 259, § 2.13(B).

\* \* \* \* \* \*

Allowance for interruptions apply to each WATS access line as set forth in (A) through (F) following:

\* \* \* \* \* \*

(C) When the WATS access line is interrupted for a period of more than 24 hours a credit of $25.40 applies for each 24 hour period or any fraction thereof. Tariff F.C.C. No. 259, § 2.4.7.(C).

Thus, in order to find defendants fully liable, they must be found to have engaged in willful misconduct. The court in *Berner v. British Commonwealth Pacific Airlines, Ltd.*, 346 F.2d 532, 536–37 (2d Cir.1965), defined willful misconduct as:

> the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage, or it may be the intentional performance of an act in such a manner as to imply reckless disregard of the probable consequences \* \* \*, [or] the intentional omission of some act, with knowledge that such omission will probably result in damage or injury, or the intentional omission of some act in a manner from which could be implied reckless disregard of the probable consequences of the omission \* \* \*.

*Berner* at 536, 537. In order for summary judgment to be granted, defendants, as the moving party, must establish that there are no genuine issues of material fact of whether or not they engaged in willful misconduct.

■ In moving for summary judgment, defendants simply contend that plaintiff failed to produce any evidence of willful misconduct in any of its allegations. Defendants contend that the only inferences that can be gleaned from the delays and disconnections of service that occurred are that the January 1, 1984 divestiture between AT & T. and Michigan Bell created an unclear line of responsibility, inadequate procedures, and poor communication between and within the two companies to properly process WATS orders; there was no willful misconduct in any of defendants' actions. Defendants cite *Caslin v. General Electric*, 696 F.2d 45, 47 (6th Cir.1982) where the court stated: "Though questions of motive and intent are jury questions, where there is no evidence of unlawful motive or intent, there is nothing to submit [to the jury]".

Plaintiff, in its seven claims that involve breach of contract, misrepresentation, negligence, and slander, does not raise any genuine issues of material fact as to intent. There is absolutely no evidence from which willful misconduct can be inferred. Thus, summary judgment will be granted.

Plaintiff contends that the defendants knew the purposes behind plaintiff's request to change the telephone lines, and that any delayed disruption in its telephone service would harm the operation of its business. Plaintiff contends that defendants have been unable to account for or explain the delays or disconnections. Plaintiff contends that defendants made false and misleading statements that hotline number installation dates would be met, and that the reservation number repair order was guaranteed to be met within four hours. Plaintiff contends that defendants were willfully negligent in interrupting the telephone service, failing to meet installation dates, make number changes, and make timely repairs. Further, plaintiff argues that defendants intentionally interfered with the contractual relationship between plaintiff and its members by disconnecting the telephone hotline service.

■ Plaintiff claims that the recorded message informing members that the line was disconnected during the Band V WATS service interruption was false and slanderous. Plaintiff contended the message was of the type given "when a person or business has failed or neglected or is unable to pay for telephone services and defendants terminate the services". Count IV, p. 49 of the Complaint. However, a message that

states the line is disconnected doesn't necessarily indicate that the business failed or was unable to pay for its telephone services. Further, in *Holman v. Southwestern Bell Telephone Co.*, 358 F.Supp. 727 (1973), the court held that "a mechanical intercept [which] would erroneously advise persons calling plaintiff's telephone numbers that the numbers were no longer in service" did not constitute willful or wanton conduct. 358 F.Supp. at 730.

Finally, plaintiff argues that the defendants intentionally interfered with the contractual relationship between plaintiff and its members by disconnecting the telephone lines and communicating the disconnection to plaintiff's customers. In order for there to be a contractual interference, it must be intentional and improper. Improper is defined as "illegal, unethical, or fraudulent". *Trepel v. Pontiac Osteopathic Hospital*, 135 Mich.App. 361, 374, 354 N.W.2d 341 (1984). Here, there is no evidence that defendants intended to interfere with plaintiff's contractual relationship with its customers.

Plaintiff cites testimony by Jean Gardiner, a Stand Buys employee, who stated that AT & T employee Barbara Douglas said "because of the divestiture ... no one [at AT & T or Michigan Bell] knew who was handling the installation of the interstate WATS Band Vs". (Gardiner deposition, Vol. I, p. 57.) Jeff Hallberg, a Michigan Bell employee, stated that the division of duties between AT & T and Michigan Bell caused Stand Buys' order to be "messed up".

Plaintiff contends that these statements show willful misconduct on the part of defendants by their conscious and intentional decision making in dividing responsibilities. These statements, when viewed in a light more favorable to plaintiff, provide no evidence at all of any intentional misconduct by defendants. At most, it shows negligence. There is absolutely nothing before the court which might suggest that defendants' conduct toward plaintiff was intentional.

Thus, summary judgment is granted as to all of plaintiff's claim requiring willful misconduct.