**MCI TELECOMMUNICATIONS CORPORATION**

v.

**TCI MAIL, INC. f/k/a Save a Life Publications, Inc.**

Civ. A. No. 91–0144L.

United States District Court, D. Rhode Island.

Sept. 13, 1991.

Hagop S. Jawharjian, Olenn & Penza, Warwick, R.I., Cynthia A. Raposo, MCI Telecommunications Corp., Washington, D.C., for plaintiff.

Kurt M. Hayes, Pawtucket, R.I., Peter S. Brooks, Brooks and Brooks, Sherbourn, Mass., for defendant.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

### I. INTRODUCTION

Plaintiff, MCI Telecommunications Corporation ("MCI"), brought this action against TCI Mail, Inc. ("TCI"), formerly known as Save a Life Publications, Inc., seeking to recover a deficiency in payment for telecommunications services. MCI is a national and international long-distance telephone carrier. TCI is a professional fund-raising consultant that represents charitable and civic organizations.

TCI filed an Answer and Counterclaim alleging that, before agreeing to provide the service, MCI had represented that it would charge a much lower rate than the rate it ultimately charged. Defendant's Counterclaim, paras. 7–9. TCI claims that it had an oral agreement with MCI, and that MCI breached this contract (Count I) and committed tortious misrepresentation (Count II). *Id.*, paras. 11–16. TCI also alleges that periodic disruptions in TCI's long-distance service constituted an additional breach of contract by MCI, causing TCI to lose thousands of dollars in lost revenue (Count III). *Id.*, paras. 10, 17–18. TCI seeks adjudication that it is not liable to MCI for the alleged deficiency, and it seeks damages from MCI for the alleged lost revenue as a result of the alleged disruptions.

MCI has moved, under Fed.R.Civ.P. 12(b)(6), to dismiss all Counts of TCI's counterclaim. MCI argues that a tariff schedule of rates filed with the Federal Communications Commission ("FCC") at the time of the agreement exclusively governs the rights and duties of the parties, regardless of any inconsistent statements that MCI's representatives may have made.

MCI asserts that the terms of this tariff preclude TCI's claims.

For the reasons that follow, MCI's motion with respect to Counts I and II, the primary contract and misrepresentation claims, is denied. MCI's motion to dismiss Count III, which alleges breach of contract as a result of disruptions in service, is granted.

### II. DISCUSSION

#### A. *Standards for Rule 12(b)(6)*

When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the Court must review the facts and pleadings in the light most favorable to the non-moving party. The moving party, here MCI, carries the burden of establishing that the non-moving party, TCI, can prove no possible set of facts that would entitle it to relief. *Harper v. Cserr*, 544 F.2d 1121, 1122 (1st Cir. 1976); *Mendonsa v. Time, Inc.*, 678 F.Supp. 967, 968 (D.R.I.1988). The allegations in the counterclaim are presumed true for the purpose of testing the sufficiency of the counterclaim. *Seveney v. United States Gov't, Dep't of Navy*, 550 F.Supp. 653, 655 (D.R.I.1982). All inferences are resolved against the moving party and in favor of the non-moving party. *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979).

#### B. *Background Facts*

When the facts and inferences are viewed in the light most favorable to TCI, the following scenario emerges. In 1989, while operating under the name Save a Life Publications, Inc., TCI investigated several long-distance telephone companies, intending to choose one to serve TCI's national telephone marketing center in Rhode Island. Long-distance telephone charges are one of TCI's largest business expenses. During several discussions between TCI and MCI, sales representatives of MCI allegedly promised that TCI's average long-distance rate with MCI would be $.12 per minute, a figure upon which TCI relied in making financial projections. In the months after TCI chose MCI as its long-distance telephone company, however, TCI found that its actual billing rate exceeded

the promised rate by nearly 50%, rendering TCI's telephone marketing center unprofitable. TCI alleges that MCI's representatives knew at the time of the representation that MCI could not provide service at the $.12 per minute rate, or, alternatively, that they recklessly disregarded the truth. Additionally, TCI claims that MCI's long-distance service failed on several occasions in 1990, causing TCI to lose several thousand dollars. TCI did not pay MCI the full amount billed. In March 1991, MCI initiated this action to recover $80,774.39, plus interest, from TCI for services rendered.

## C. *Tariffs Under the Communications Act of 1934*

■ The Communications Act of 1934, as amended, requires common carriers, including long-distance telephone carriers, to file and maintain a schedule, or tariff, of contractual terms and conditions with the FCC. 47 U.S.C. § 203(a)-(b) (1988); *MCI Telecommunications Corp. v. FCC*, 765 F.2d 1186, 1188, 1191 (D.C.Cir.1985). A tariff filed with the FCC must set forth the carrier's charges, classifications, practices, and regulations. 47 U.S.C. § 203(a) (1988). The contents of the tariff are subject to FCC regulation and approval. *Id.* § 203(b)(2). Under the "filed tariff doctrine," a tariff filed with the FCC supersedes all other agreements for interstate telephone services.[1] *Id.* § 203(c); *Marco Supply Co. v. AT & T Communications, Inc.*, 875 F.2d 434, 436 (4th Cir.1989). Purchasers of interstate telephone services are presumed to know the terms of any relevant tariff. *Marco Supply*, 875 F.2d at 436.

■ MCI's contractual relationships with its customers are governed by MCI Tariff FCC No. 1 ("MCI Tariff"). The MCI Tariff, and not the representations of MCI's salespeople, thus determines the terms of the contract between the parties. Accidental or intentional misquotation of a rate governed by a filed tariff cannot alter the terms of a binding contract based on the tariff.

Aside from *Marco Supply*, 875 F.2d 434, the weight of judicial authority concerning the filed tariff doctrine relates only to the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101–11917 (1988), and not to the Communications Act of 1934, 47 U.S.C. §§ 151–613 (1988). *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, —— U.S. ——, 110 S.Ct. 2759, 2765, 111 L.Ed.2d 94 (1990); *Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 572, 41 S.Ct. 584, 586, 65 L.Ed. 1094 (1921) (interpreting the superseded Act to Regulate Commerce). Judicial construction of the ICA, including recent opinions from the U.S. Supreme Court and the First Circuit Court of Appeals, has consistently reaffirmed the rule that a filed tariff sets the terms of all contracts operating under the ICA, despite any contrary agreements between the parties. *Maislin*, 110 S.Ct. at 2765–71; *Delta Traffic Service, Inc. v. Transtop, Inc.*, 902 F.2d 101, 102–03 (1st Cir.1990).

This Court can locate no federal opinion, other than *Marco Supply*, 875 F.2d 434, defining the effect of a tariff filed pursuant to the Communications Act of 1934. In that case, Marco Supply Company ("Marco") alleged that it had contracted with AT & T Communication, Inc. ("AT & T") to provide telephone services, and that it had entered into the contract based on AT & T's oral and written quotation of installation and monthly service rates. When Mar-

---

**1.** 47 U.S.C. § 203(c) (1988) provides:

No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

co received its first bill, it found that it was charged under a filed AT & T tariff at nearly 50% more than the promised rate. Marco's suit charged breach of contract and willful misrepresentation. The United States District Court for the Western District of Virginia dismissed Marco's complaint, and the Fourth Circuit Court of Appeals affirmed. Applying the filed tariff doctrine, the Fourth Circuit explained that "a regulated carrier *must* charge the tariff rate established with the appropriate regulatory agency, even if it has quoted or charged a lower rate to its customer." *Id.* at 436.

The filed tariff doctrine often leads to harsh and seemingly unfair results. *See, e.g., Maislin*, 110 S.Ct. at 2763, 2766–67; *Louisville & Nashville*, 237 U.S. at 97, 35 S.Ct. at 495; *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 343 (1st Cir.) (tariff filed under Motor Carrier Act of 1935, 49 U.S.C. §§ 301–327), *cert. denied*, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970). This strict rule could permit a carrier deliberately to misrepresent its rates to unwitting customers and then demand the full tariff amount after the contract is performed, even many years after the transaction. *See, e.g., Marco Supply*, 875 F.2d at 436; *Delta Traffic Serv., Inc. v. Armstrong World Indus., Inc.*, 703 F.Supp. 525, 527–28 (S.D.Miss. 1988).

Despite this potential for injustice, the rationale for the rule is compelling. To allow a regulated carrier, under any circumstances, to charge less than the rate contained in the filed tariff would "be giving a preference to and discriminating in favor of the customer in question." *Marco Supply*, 875 F.2d at 436. As the Supreme Court has explained in connection with the ICA:

> If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose to establish a rate duly published, known to all, and from which neither shipper nor carrier may depart.... Any other construction of the statute opens the door to the possibility of the very abuses of unequal

rates which it was the design of the statute to prohibit and punish.

*Armour Packing Co. v. United States*, 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908). Congress has clearly expressed its desire not to allow price discrimination through deviations from published tariffs. *Maislin*, 110 S.Ct. at 2768; *Western Union*, 256 U.S. at 573, 41 S.Ct. at 587; *Louisville & Nashville*, 237 U.S. at 97, 35 S.Ct. at 495; *Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1230–31 (7th Cir.1982). The Supreme Court has refused to diverge from this longstanding policy, *Maislin*, 110 S.Ct. at 2768–69, despite arguments from the Interstate Commerce Commission, among others, that stern application of the filed tariff doctrine is inconsistent with contemporary deregulation. *See Orscheln Bros. Truck Lines, Inc. v. Zenith Elec. Corp.*, 899 F.2d 642, 644–45 (7th Cir.), *judgment vacated*, —— U.S. ——, 111 S.Ct. 334, 112 L.Ed.2d 300 (1990); *Maislin*, 110 S.Ct. at 2777–79 (Stevens, J., dissenting).

### D. *The MCI Tariff*

■ Analysis of the counterclaim does not end with the conclusion that the MCI Tariff governs. By its own terms, the MCI Tariff does not limit MCI's liability if judicial or administrative proceedings establish that MCI committed "willful misconduct." MCI Tariff, section B, para. 4.02, 9th Revised Page 10. Viewing the pleadings in the light most favorable to TCI, as required by Fed.R.Civ.P. 12(b)(6) and 8(f), this Court understands TCI's Count I to allege that MCI's actions constituted "willful misconduct" and therefore violated the MCI Tariff, an alleged breach of contract. Count II similarly claims that the MCI Tariff allows liability for MCI's alleged "willful misconduct," which allegedly supports tort liability for intentional misrepresentation.

Does the Communications Act of 1934 prohibit recovery by TCI under any theory of liability, regardless of the terms of the MCI Tariff? Certainly, the *tariff as a whole*, and not merely the rates contained therein, is paramount. Otherwise, many provisions of the MCI Tariff would be meaningless. The entire MCI Tariff must be controlling, including the "willful mis-

conduct" clause. *See Stand Buys, Ltd. v. Michigan Bell Tel. Co.*, 646 F.Supp. 36, 37–38 (E.D.Mich.1986) (applying "willful misconduct" clause of carrier's tariff, but concluding that no evidence of willful misconduct existed at summary judgment stage); *Pilot Indus. v. Southern Bell Tel. & Tel. Co.*, 495 F.Supp. 356, 361–62 (D.S.C.1979) (applying clause in filed tariff allowing liability for willful or wanton conduct, but finding no evidence of willfulness or wantonness at summary judgment stage); *Sommer v. Mountain States Tel. & Tel. Co.*, 21 Ariz.App. 385, 387–88, 519 P.2d 874, 876–77 (1974) (holding that clause in filed tariff permitted recovery for willful acts).

The MCI Tariff itself does not clearly preclude a contract or tort claim against MCI based on its alleged "willful misconduct." MCI has not attempted, moreover, to characterize the alleged representations of its salespeople as being outside the scope of their agency relationship. Recovery by TCI, therefore, is not precluded.

Analysis of the Communications Act of 1934 supports this conclusion. The Act prohibits *"unjust or unreasonable* discrimination" in a carrier's rates, and it prevents making or giving "any *undue or unreasonable* preference or advantage" to any customer.[2] 47 U.S.C. § 202(a) (1988) (emphasis added). The adjectives "unjust," "undue," and "unreasonable" clearly suggest that some kinds of "just" and "reasonable" price discrimination and preferences are not unlawful. Thus, the Act does not require this Court to avoid, under *all* circumstances, "giving a preference to and discriminating in favor of the customer in question," the evil that the Fourth Circuit Court of Appeals sought to avoid in *Marco Supply*, 875 F.2d at 436. A preference that is not "undue" or "unreasonable" need not violate the statute.

Section 203(c) of the Act, moreover, explicitly allows a filed tariff to provide exceptions to its rate structure. The Act forbids a regulated carrier to "refund or remit by any means or device any portion of the charges" set forth in the tariff, *"except as specified in such schedule."* 47 U.S.C. § 203(c) (1988) (emphasis added). Under the Act, if a filed tariff provides an exception to the tariff's schedule of charges, then this is a possible avenue for recovery.

This Court is aware that its holding contradicts the Fourth Circuit Court of Appeals' decision in *Marco Supply*, 875 F.2d at 436. MCI correctly reads *Marco Supply* as dismissing an aggrieved customer's tortious misrepresentation claim, notwithstanding a clause in the relevant tariff permitting liability for "willful misconduct." The *Marco Supply* decision presumes that Congress determined that the need to prevent price discrimination in interstate telephone service is so great that even fraudulent misrepresentation of a tariff rate is not actionable. *Id.* But the *Marco Supply* Court engages in no analysis of the language or history of the Communications Act of 1934; instead, it simply applies blindly the doctrines that were spawned by the ICA. These two statutes are, of course, not the same. Most significantly, the Communications Act of 1934 recognizes an exception to the filed tariff doctrine for refunds from a tariff rate that are "specified in such schedule." 47 U.S.C. § 203(c) (1988). The ICA does not. *See* 49 U.S.C. § 10761(a) (1988). While the facts of *Marco Supply* are similar to those of the present case, the *Marco Supply* Court's analysis on this limited issue is questionable, and this Court declines to follow that part of its holding.

Consequently, MCI cannot show, as a matter of law, that TCI could not recover under Counts I and II of its counterclaim. If TCI can prove "willful misconduct" by MCI during the negotiations to provide services to TCI, and if TCI can demonstrate

---

**2.** 47 U.S.C. § 202(a) (1988) provides:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

that the MCI Tariff permits recovery for liability arising out of such conduct, then recovery is not legally precluded. Counts I and II of TCI's counterclaim, alleging breach of contract and intentional misrepresentation, therefore, do not fail to state claims upon which relief can be granted.

■ Count III, claiming damages for breach of contract when MCI's services to TCI were periodically interrupted, fails to state a claim upon which relief can be granted. Absent "willful misconduct," which TCI has not alleged in connection with the disruption of its long-distance service, the MCI Tariff limits MCI's liability for interruptions to a proportionate credit allowance. MCI Tariff, section B, para. 4.02, 21st Revised Page 15. *See Pilot Indus.*, 495 F.Supp. at 360–63; *Schaafs v. Western Union Tel. Co.*, 215 F.Supp. 419, 420 (E.D.Wis.1963). There is no allegation that MCI did not give the credit allowance in this case.

### III. CONCLUSION AND ORDER

Accordingly, MCI's motion to dismiss Counts I and II of TCI's counterclaim, for failure to state a claim upon which relief can be granted, is denied. MCI's motion to dismiss Count III of the counterclaim is granted.

It is so ordered.