NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Conservator of Fairlawn Credit Union, Plaintiff,

v.

Anthony J. REGINE, Henry V. Rosciti, Anthony F. Rosciti, Michael A. Cinquegrano, Providence Marine Realty, Inc., and Barge In, Inc., Defendants.

No. CA 89–0688L.

United States District Court, D. Rhode Island.

May 19, 1992.

Eileen M. Hagerty, Kern, Sosman, Hagerty, Roach & Carpenter, P.C., Boston, Mass., Kevin M. Brill, Corrente & Brill, Providence, R.I., for plaintiff.

George M. Vetter, Jr., Thomas W. Lyons, III, Vetter & White, Inc., Providence, R.I., for A. Regine.

Robert B. Mann, Mann & Mitchell, Providence, R.I., for M. Cinquegrano.

Anthony J. Brosco, Brosco & Brosco, P.C., Providence, R.I., for Henry Rosciti, Anthony Rosciti, Providence Marine Realty and Barge In, Inc.

## MEMORANDUM AND ORDER

LAGUEUX, District Judge.

### I. INTRODUCTION

This matter is before the Court on cross-motions for summary judgment and the plaintiff's motion to dismiss counterclaims. The facts in this case, as alleged by the National Credit Union Administration Board ("NCUAB") in its Amended Complaint, are already set forth in *National Credit Union Admin. Bd. v. Regine*, 749 F.Supp. 401, 403–04 (D.R.I.1990). Fairlawn Credit Union ("Fairlawn") became the successor in interest of Co-op Credit Union ("Co-op") in March 1988. The NCUAB then became the conservator of Fairlawn on November 15, 1989. One of the properties at the center of this dispute—Plat 14, Lot 10 on Moosehorn Road in East Greenwich, Rhode Island—is known in this litigation as the "Moosehorn Property."

In counts III, IV, V, VI, and VII of its Amended Complaint, the NCUAB claims that the defendants have defaulted on various promissory notes now held by the NCUAB totaling $1,250,000, resulting in damages of approximately $1,531,390. Co-op and the defendants created these notes between February and November 1988. Specifically, the NCUAB alleges that defendants Henry Rosciti and Michael Cinquegrano have defaulted on promissory notes for $485,000 and $125,000; that defendants Anthony Rosciti, Anthony Regine, and Barge In, Inc., have defaulted on a note for $540,000; that Providence Marine Realty, Inc., has not performed on its guarantee of this $540,000 loan; and that defendants Regine, Anthony Rosciti, and Providence Marine Realty, Inc., have defaulted on a note for $100,000.

In their counterclaims, defendants Regine, Henry Rosciti, and Cinquegrano allege, first, that Fairlawn agreed before its conservatorship to alter the terms of some of the notes, and that their actions did not constitute default under these modified terms; and second, that the NCUAB unlawfully refused to discharge the mortgage on the Moosehorn Property, which secured the promissory note for $485,000, thereby excusing the defendants' performance on all the notes.

The NCUAB now seeks summary judgment on counts III, IV, V, VI, and VII of its Amended Complaint—the contract claims—and on the defendants' counterclaims that sound in contract. The NCUAB also seeks dismissal, pursuant to Rule 12(b)(6), of the other, non-contract counts of the counterclaims. Defendants Regine and Cinquegrano each seek summary judgment dismissing the NCUAB's entire Amended Complaint and in favor of their counterclaims.

For the reasons that follow, the NCUAB's motions for summary judgment and dismissal are granted. Regine's motion for summary judgment is granted as to count IX of the Amended Complaint. The remainder of Regine's motion for summary judgment is denied. Cinquegrano's motion for summary judgment is granted

as to counts I and XI of the Amended Complaint. The remainder of Cinquegrano's motion for summary judgment is denied.

## II. THE NCUAB'S MOTION FOR SUMMARY JUDGMENT IN FAVOR OF ITS AMENDED COMPLAINT

### A. *Summary Judgment and Dismissal Standards*

Rule 56(c) of the Federal Rules of Civil Procedure provides the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A dispute over some facts does not preclude summary judgment if all the facts and reasonable inferences drawn from them support judgment for the moving party. *King v. Sullivan,* 776 F.Supp. 645, 649 (D.R.I.1991). The Court must view the record in the light most favorable to the party opposing the motion, indulging all inferences favorable to that party. *Id.*

A party moving to dismiss under Fed.R.Civ.P. 12(b)(6) carries the burden of establishing that the non-moving party can prove no possible set of facts that would entitle it to relief. *Harper v. Cserr,* 544 F.2d 1121, 1122 (1st Cir.1976). The allegations in the claim are presumed true for the purpose of testing the sufficiency of the claim. *MCI Telecommunications Corp. v. TCI Mail, Inc.,* 772 F.Supp. 64, 65 (D.R.I. 1991). The Court must review the pleadings in the light most favorable to the non-moving party, resolving all inferences in favor of the non-moving party. *Gladstone, Realtors v. Bellwood,* 441 U.S. 91, 109, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979).

### B. *The Promissory Notes and the D'Oench, Duhme Doctrine*

#### 1. Background

There is no dispute that the defendants stopped making payments on the

four promissory notes by May 1989. Under the terms of these notes, the holder may demand repayment of the entire amounts owed. *See* Amended Complaint, Exhibits A, B, D, & E. The parties dispute whether Fairlawn declared all the notes to be due after the NCUAB became Fairlawn's conservator in November 1989. In any event, the filing of this lawsuit in December 1989 amounts to such a declaration.

The defendants deny liability on the notes, based upon the alleged existence of an oral agreement between them and Fairlawn before the NCUAB became conservator. Fairlawn, they claim, agreed in the summer of 1989, through its former manager, Ernest Spooner, to defer payment on all the notes while Rhode Island Central Credit Union ("RICCU") prepared to refinance the $485,000 note. In return, defendants claim, they would quickly pay off the $485,000 note and pay off all delinquencies on the $540,000 note. According to the defendants, this unwritten agreement constituted a waiver by Fairlawn of any default, and it linked the settlement of delinquencies on the $485,000 and $540,000 notes. When the NCUAB demanded full repayment through this lawsuit, the defendants claim, it violated this modified agreement with Fairlawn.

As a matter of law, this alleged side agreement effectively vanished when the NCUAB became Fairlawn's conservator. The doctrine of *D'Oench, Duhme* prevents the defendants from asserting any defense against the NCUAB that depends upon the existence of an unwritten agreement between the defendants and Co-op or Fairlawn. Originating in a seminal Supreme Court opinion, *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), this doctrine is now grounded in both federal common law and, to a lesser extent, federal statute, 12 U.S.C. § 1787(p)(2). This common law principle prevents the Court from enforcing the defendants' alleged oral agreement with Spooner.

### 2. The Federal Statute

■ The relevant federal statute does not protect the NCUAB. In enacting 12 U.S.C. § 1787(p)(2), Congress intended to preclude the use of unwritten agreements against the NCUAB in its capacity as receiver, but not as conservator. The statute provides that "[n]o agreement which tends to diminish or defeat the right, title, or interest of the Board in any asset *acquired by it under this subsection*, either as security for a loan or by purchase, shall be valid against the Board unless such agreement ... shall be in writing...." 12 U.S.C. § 1787(p)(2) (1988) (emphasis added). "The Board" means the NCUAB. *Id.* § 1752(4). But in order to receive the protection of section 1787(p)(2), the NCUAB must acquire the note "under this subsection." *Id.* § 1787(p)(2). The phrase "acquired by it under this subsection" means acquired *under subsection (p) of section 1787*. And subsection (p) pertains only to *liquidation* of credit unions. *See id.* § 1787(p)(1). Therefore, the structure and plain language of the statute limit the statutory rule against enforcing unwritten agreements to situations in which the NCUAB is acting as receiver, but not as conservator.

### 3. Federal Common Law

Although the federal statute does not protect the NCUAB as conservator, federal common law does. Like the statute, the doctrine of *D'Oench, Duhme* applies to disputes involving the NCUAB. *Savoy v. White*, 788 F.Supp. 69, 71 (D.Mass.1992); *National Credit Union Admin. Bd. v. First Nat'l Bank of Chicago*, 690 F.Supp. 1580, 1582 (N.D.Ill.1988) (and cases cited). But unlike the statute, the common law doctrine applies even when the banking authority takes over as *conservator*. *Savoy*, 788 F.Supp. at 71; *Resolution Trust Corp. v. Clark*, 741 F.Supp. 896, 898 (S.D.Fla.1990). This common law estoppel doctrine prohibits borrowers from using unrecorded agreements to defend against efforts by the NCUAB, as conservator of a failing credit union, to collect on a note held by the credit union. *See D'Oench, Duhme*, 315 U.S. at 458, 62 S.Ct. at 679; *Savoy*, 788 F.Supp. at 71; *Fleet Bank of Maine v. Steeves*, 785 F.Supp. 209, 213 (D.Me.1992).

Applying the *D'Oench, Duhme* doctrine in favor of the NCUAB when it is acting as conservator is consistent with the doctrine's purposes. The doctrine encourages proper recording of bank transactions, guards against collusive attempts to alter lending terms, permits regulators to evaluate accurately the assets of banking institutions, and generally protects the public fisc, which is exposed to losses through federal insurance. *See Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 91–93, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987); *Federal Deposit Ins. Corp. v. Caporale*, 931 F.2d 1, 2 (1st Cir.1991). The doctrine favors depositors and creditors of troubled financial institutions, who cannot protect themselves from secret side agreements, over borrowers, who can protect themselves. *Timberland Design, Inc. v. First Serv. Bank for Sav.*, 932 F.2d 46, 48 (1st Cir.1991). These considerations are all advanced when the NCUAB, as conservator, asserts the *D'Oench, Duhme* doctrine.

The defendants' contention that the unwritten agreement does not tend to defeat the NCUAB's title in the promissory notes is incorrect and also irrelevant. Contrary to the defendants' assertions, the NCUAB now has title to the notes. When the NCUAB becomes "conservator or liquidating agent" of a credit union, it "succeed[s] to ... all rights, titles, powers, and privileges of the credit union ... and ... title to the books, records, and assets of any previous conservator or other legal custodian...." 12 U.S.C. § 1787(b)(2)(A) (1988). And contrary to the defendants' position, their claim of an unwritten agreement clearly tends to diminish or defeat the NCUAB's right, title, or interest in the promissory notes. *See National Credit Union Admin. Bd. v. Metro Spanish Food Wholesalers, Inc.*, 1991 WL 20001 *1–2 (S.D.N.Y. Feb. 7, 1991). But most importantly, such assertions are irrelevant. The *D'Oench, Duhme* doctrine simply prevents the defendants from proffering any defense against the NCUAB that depends upon the existence of an unwritten agreement between the defendants and Co-op or Fairlawn. Who technically holds title to the notes and who actually benefits from the unwritten agreement are not determinative factors.

The *D'Oench, Duhme* doctrine gives the NCUAB great advantages. The agency may use the doctrine both as a shield against claims of a borrower and as a sword to estop a borrower from denying liability on a note. *Timberland*, 932 F.2d at 49; *Savoy*, 788 F.Supp. at 71–72. The doctrine applies even when the borrower was not at fault except in failing to reduce the agreement to writing. *Timberland*, 932 F.2d at 49. Good faith is irrelevant: if the borrower has lent himself to an arrangement that might mislead bank regulators, then the doctrine prevents the borrower from challenging the note's validity against the regulator. *Langley*, 484 U.S. at 93, 108 S.Ct. at 402; *Caporale*, 931 F.2d at 2. The doctrine applies against a borrower's contract *and* tort claims. *Timberland*, 932 F.2d at 50; *Savoy*, 788 F.Supp. at 71–72.

### 4. Preemption

The defendants argue that 12 U.S.C. § 1787(p)(2) preempts the common law doctrine of *D'Oench, Duhme*. The parties have identified no opinions answering this question, and the Court could locate none. The Court may, however, look for guidance in the cases interpreting 12 U.S.C. § 1823(e), the similar provision in the FDIC's enabling statute upon which section 1787(p)(2) was modeled. The United States District Court for the District of Massachusetts has stated that the case law interpreting 12 U.S.C. § 1823(e) is generally applicable to 12 U.S.C. § 1787(p)(2). *Savoy*, 788 F.Supp. at 71. Because sections 1787(p)(2) and 1823(e) are essentially identical codifications of parts of the *D'Oench, Duhme* doctrine as applied to different banking agencies, the Court may reasonably conclude that Congress intended these statutes to have the same relationship to the common law. In short, if section 1823(e) does not preempt *D'Oench, Duhme*, then neither does section 1787(p)(2).

Federal decisions agree that section 1823(e) does not limit the federal courts'

power to apply *D'Oench, Duhme. Federal Sav. & Loan Ins. Corp. v. Griffin,* 935 F.2d 691, 698 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1163, 117 L.Ed.2d 410 (1992); *Midwest Sav. Ass'n, F.A. v. National W. Life Ins. Co.,* 758 F.Supp. 1282, 1290 n. 6 (D Minn.1991). Sections 1823(e) and 1787(p)(2) give no indication of congressional intent to preempt *D'Oench, Duhme.* Their scope is also far too limited to preempt the larger common law doctrine. Congress has not "comprehensively occupied [the] field and thereby displaced or preempted [the] judicially-fashioned federal rule." *See Conille v. Secretary of Hous. & Urban Dev.,* 840 F.2d 105, 111 (1st Cir.1988). The frequent application of *D'Oench, Duhme* since the enactment of sections 1823(e) and 1787(p)(2), moreover, shows that the federal courts do not consider the common law doctrine of *D'Oench, Duhme* to be extinct. *See, e.g., Timberland,* 932 F.2d at 48–51.

The common law doctrine of *D'Oench, Duhme* prevents the defendants from asserting any defenses based on an unwritten agreement with Fairlawn or Co-op. Aside from the alleged side-agreement with Spooner, the defendants assert only one other excuse for not making payment on the notes: Fairlawn's alleged violation of Rhode Island's mortgage release statute.

### C. *The Rhode Island Mortgage Release Statute*

■ The defendants additionally claim that Fairlawn unlawfully refused to assure them that it would discharge the mortgage on the Moosehorn Property in November 1989, thereby excusing the defendants' obligations to perform on all the notes. The defendants allege that on the scheduled day of closing, November 22, 1989, RICCU was ready, willing, and able to loan the defendants $1.1 million, which would be secured by a first mortgage on the Moosehorn Property, if only Fairlawn would give assurance that it would discharge its mortgage. When the defendants sought assurance that Fairlawn would release the mortgage, the defendants claim, Fairlawn, now under the NCUAB's conservatorship, com-

municated that it would "comply with Rhode Island law" but did not state outright that it would discharge the mortgage. When RICCU made clear that it needed express assurance that Fairlawn would discharge the mortgage, Fairlawn did not provide it. As a result, defendants contend, RICCU did not approve the $1.1 million loan, the defendants suffered damages, and they were excused from further performance on all the notes.

■ Before analyzing the propriety of Fairlawn's actions, this Court can dispose of two arguments made by the defendants. First, the defendants' assertion that Fairlawn's allegedly wrongful behavior with regard to the single $485,000 note somehow excused their performance on *all* the notes is not based on the terms of the notes or any law familiar to this Court. The defendants have no legitimate excuse for not making payment on the notes that are not secured by the Moosehorn Property. Second, even if the NCUAB or Fairlawn illegally refused to give the requested assurance, this would not eliminate the defendants' continuing duty to make regular payments on the $485,000 note (and the other notes). A lender's wrongful attempt to accelerate a note does not relieve the borrower of its unilateral obligation to continue making the periodic payments required by the note. *Fleet Nat'l Bank v. Liuzzo,* 766 F.Supp. 61, 65–66 (D.R.I.1991). The proper reaction to a lender's wrongful refusal to release a mortgage is to bring suit for legal or equitable relief while continuing to make payments on the note.

Rhode Island's Mortgage Release Statute, R.I.Gen.L. §§ 34–26–1 through 34–26–7, governs this dispute. The statute, most recently amended in 1987,[1] provides:

> Every mortgagee of real estate, his heirs, executors, administrators, successors or assigns, *having received full satisfaction* for the money due on such mortgage, shall, within thirty (30) days after final payment discharge the same.... Any mortgagor or his agent *upon tendering final payment* to the

---

1. R.I.Pub.L.1987, ch. 216, § 1.

mortgagee in *full satisfaction* of the mortgage may in writing require the mortgagee to issue the discharge by separate instrument of release....

R.I.Gen.L. § 34–26–2(a) (Michie 1991 Supp.) (emphasis added). A subsequent section of the statute provides:

> If any mortgagee, his heirs, executors, administrators, successors or assigns, shall not, within ten (10) days after a request made in that behalf and *a tender of all reasonable charges therefor,* discharge such mortgage in one of the modes aforesaid, or otherwise make and execute a release and quitclaim of the estate so mortgaged, and acknowledge the same before some proper officer, or transfer such mortgage if required under the provisions of § 34–26–4, he or they so refusing shall be liable to make good all damages that shall accrue for want of such discharge, release or transfer....

*Id.* § 34–26–5 (emphasis added).

The words of the statute are clear. In order to trigger the mortgagee's duty to discharge, the mortgagor must tender final payment of all amounts owed. The statute does not say that the duty to release arises when the mortgagor *offers* to tender, or *shows an ability* to tender. The words of the statute must be given their ordinary meaning. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). These words clearly provide that anything less than a complete tender is insufficient to initiate the mortgagee's statutory duty to discharge.

Nonetheless, the defendants interpret the statute as creating a duty to discharge when the mortgagor demonstrates to the mortgagee that the mortgagor is willing and able to tender. In support of this view, they cite a Rhode Island Supreme Court decision from 1931, *Williamson v.*

*Lincoln Realty & Mortgage Corp.,* 155 A. 350 (R.I.1931). This opinion, however, does not support the defendants' position.

First, the opinion does not speak of demonstrating *to the mortgagee* the mortgagor's ability to tender. Instead, the Rhode Island Supreme Court said:

> The complainant must, of course, in order to demand a reconveyance of the premises, either make a tender of the amount due or demonstrate *to the satisfaction of the court* that he has the ability so to do.

*Id.* at 350 (emphasis added). Requiring discharge or reconveyance when the mortgagor can demonstrate "to the satisfaction of the court" an ability to tender does not imply a duty to discharge when the mortgagor can demonstrate an ability to tender to the satisfaction of *someone else.* The rule stated in *Williamson* means that when a mortgagor sues in equity for the release of a mortgage, and a court with jurisdiction then determines that the mortgagor is able to tender the full amount owed, the court may compel the mortgagee to discharge its mortgage upon payment of the full amount due. This unremarkable rule of equity must necessarily be limited to judicial proceedings. Since no court was involved in the defendants' attempt to obtain a discharge of the mortgage on the Moosehorn Property, the stated rule of *Williamson* did not require the NCUAB or Fairlawn to discharge the Moosehorn Property mortgage or to assure RICCU that it would.

Second, although *Williamson* is apparently the only Rhode Island case discussing the issue, the opinion has questionable value as precedent. Although the language of the governing statute at the time of the *Williamson* decision, R.I.Gen.L.1923, ch. 302, used language that is identical to the crucial words of today's statute,[2] the *Wil-*

---

**2.** The 1923 statute provided:

> Every mortgage of real or personal estate, his heirs, executors, administrators or assigns, *having received full satisfaction* for the money due on such mortgage, shall, at the request of the mortgagor, his heirs, executors, administrators or assigns, and at his or their cost, discharge the same....

R.I.Gen.L.1923, ch. 302, § 5 (emphasis added). The statute continued:

> If any mortgagee, his heirs, executors, administrators or assigns, shall not, within 10 days after a request made in that behalf and *a tender of all reasonable charges therefor,* discharge such mortgage in one of the modes aforesaid, or otherwise make and execute a

*liamson* opinion does not refer to any statute. In fact, the opinion does not refer to a single source of legal authority. If *Williamson* states a common law principle prevailing in 1931, then the 1987 statute surely supersedes it. If *Williamson* suggests a construction of the 1923 forerunner of § 34–26–2, then the 1987 version also supersedes it. No reported cases cite *Williamson.*

The refusal of the NCUAB and Fairlawn to give assurance that Fairlawn would discharge the Moosehorn Property mortgage was not an outright refusal to discharge. According to the evidence identified by the defendants, Fairlawn never communicated that it would refuse to discharge the mortgage if the defendants, pursuant to the statute, tendered the full amount owed. *See* Wheeler Depo., pp. 60–94; Lisa Aff., para. 6; Fishlock Depo., pp. 45–47. Fairlawn refused to commit itself *in advance of receiving full tender* to discharging the Moosehorn Property mortgage. Fairlawn instead communicated its concerns that the suggested payoff amount would be insufficient to cover all debts and delinquency assessments. Fairlawn chose to exercise its statutory right to wait until the defendants tendered the full amount due before releasing the mortgage. Tendering the full amount may have been inconvenient for the defendants, but no evidence indicates that it would have been futile.

The statute gives a mortgagee ten days after receiving full payment to discharge the mortgage. This time period allows a mortgagee to make the investigations, calculations, and arrangements that are necessary before it can prudently release a mortgage. Fairlawn acted consistently with Rhode Island law in refusing to give the assurance that RICCU sought. The law of Rhode Island simply does not require a mortgagee to give such assurances under these conditions. Since Fairlawn had no duty to give the requested advance assurance that it would discharge the mortgage on the $485,000 note, it was entitled to make any such assurance conditional upon

> release and quitclaim of the estate so mortgaged . . . he or they so refusing shall be liable to make good all damages that shall accrue

the defendants' making additional payments on the other notes.

Because the alleged violation of R.I.Gen.L. ch. 34–26 is the defendants' only remaining argument in opposition to the plaintiff's motion for summary judgment on counts III, IV, V, VI, and VII, this part of the plaintiff's motion for summary judgment is granted. Of course, an evidentiary hearing will be necessary to determine the amounts due on the notes, including collection costs and attorneys' fees.

## III. THE NCUAB'S MOTION FOR SUMMARY JUDGMENT AND DISMISSAL OF THE COUNTERCLAIMS

### A. *D'Oench, Duhme and the Mortgage Release Statute*

Fairlawn's actions were consistent with Rhode Island's mortgage release law and are protected by the *D'Oench, Duhme* doctrine. Accordingly, even if the defendants could prove all of the facts that they have alleged, none of their other counterclaims—whether based upon alleged violations of R.I.Gen.L. §§ 34–26–2 (mortgage release statute), 11–42–2 (extortion), 7–15–2 (state RICO), or common law doctrines of negligence, interference with advantageous relations, or good faith and fair dealing—states a claim upon which relief can be granted. All counterclaims must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

### B. *The Extortion and Racketeering Counterclaims*

 Because Fairlawn acted well within its rights when refusing to give advance assurance that it would discharge the Moosehorn Property mortgage, the defendants' counterclaims based upon alleged violations of Rhode Island's extortion statute, R.I.Gen.L. § 11–42–2, and the state's anti-racketeering law, R.I.Gen.L. §§ 7–15–1 through 7–15–11, must be dismissed. Fairlawn's duty to discharge was simply never triggered.

> for want of such discharge, release or transfer. . . .
>
> *Id.* § 8 (emphasis added).

Racketeering is predicated upon the commission or threatened commission of a crime listed in R.I.Gen.L. § 7–15–1(a). *See NCUAB v. Regine*, 749 F.Supp. at 412. In this case, the defendants allege that the NCUAB or Fairlawn engaged in extortion, which, if proved, might support a claim under R.I.Gen.L. § 7–15–4. In Rhode Island, extortion consists of a verbal threat to injure the victim, accompanied by an intent to compel the victim to do an act against his or her will. R.I.Gen.L. § 11–42–2 (Michie 1981); *State v. Pule*, 453 A.2d 1095, 1097–98 (R.I.1982); *State v. Sabitoni*, 434 A.2d 1339, 1342 (R.I.1981).

Under the facts alleged by the defendants, Fairlawn committed neither extortion nor racketeering. The Court has difficulty finding a threat in Fairlawn's refusal to give assurance that it would discharge the Moosehorn Property mortgage before receiving a tender of the full amount owed. In any event, as a matter of law, Fairlawn's lawful adherence to Rhode Island's mortgage release statute cannot be characterized as extortion.

Therefore, even if there were no other reasons justifying dismissal, the defendants' extortion and racketeering claims must be dismissed for failure to state a claim upon which relief can be granted.

### C. *The Federal Tort Claims Act*

In addition to asserting (correctly) that Fairlawn's refusal to discharge the Moosehorn Property mortgage was proper, the NCUAB also argues that all tort counts alleged in the counterclaims are barred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) & 2671–2680 (1988). This is a supplemental, alternative argument; the Court's findings with regard to *D'Oench, Duhme* and the mortgage release statute are independently sufficient to support the Court's dismissal of the counterclaims.

All parties agree that, if the FTCA applies, then it bars the defendants' tort counterclaims. The defendants assert, however, that the actions of Fairlawn, not the federal government, caused their injuries. For this reason, the defendants assert that the FTCA does not apply to this case.

The NCUAB was Fairlawn's conservator when the alleged torts against the defendants occurred. The NCUAB became Fairlawn's conservator on November 15, 1989, and on November 21, 1989, Fairlawn refused to give assurance that it would discharge the Moosehorn Property mortgage.

The determinative question is not whether the NCUAB's role as conservator cloaks Fairlawn in the FTCA's protective shroud. The issue is much simpler. Fairlawn is not a party to this case; the counterclaims are asserted only against the NCUAB.

The NCUAB is an agency of the federal government. 12 U.S.C. § 1752a (1988); *NCUAB v. Regine*, 749 F.Supp. at 408. The FTCA bars tort claims against the United States that are based upon "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government" or "interference with contract rights." 28 U.S.C. §§ 2680(a), 2680(h) (1988). The NCUAB, acting as conservator, is entitled to this protection. *United States v. Gaubert*, —— U.S. ——, 111 S.Ct. 1267, 1275–79, 113 L.Ed.2d 335 (1991). Like the *D'Oench, Duhme* doctrine, the FTCA bars the tort claims against the NCUAB.

## IV. REGINE'S AND CINQUEGRANO'S MOTIONS FOR SUMMARY JUDGMENT ON THE AMENDED COMPLAINT

### A. *The Counts that Remain*

Anthony Regine and Michael Cinquegrano have moved for summary judgment in their favor on the NCUAB's entire Amended Complaint. Since the Court grants summary judgment in favor of the NCUAB and against all defendants on counts III, IV, V, VI, and VII of the Amended Complaint, Regine's and Cinquegrano's motions for summary judgment with respect to these counts must necessarily fail. The remaining counts state claims for fraud against all individual defendants (count I), breach of fiduciary duty by Regine (count II), negligence and recklessness by Regine (counts

VIII and IX), and racketeering by all individual defendants, in violation of Rhode Island's anti-racketeering statute (count XI). Count X of the Amended Complaint, alleging violation of the federal anti-racketeering statute, was dismissed against all defendants in 1990. *NCUAB v. Regine*, 749 F.Supp. at 414.

A defendant is entitled to summary judgment if the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). After adequate time for discovery, when a defendant moving for summary judgment identifies for the court the fatal deficiencies in the plaintiff's case, a plaintiff's "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" and compels summary judgment in favor of the defendant. *Id.* at 322–23, 106 S.Ct. at 2552.

### B. The Claims Against Regine for Breach of Fiduciary Duty, Negligence, and Recklessness

The NCUAB's claim that Regine breached his fiduciary duty to Co-op is based upon sufficient proof to withstand Regine's summary judgment motion. In Count II of the Amended Complaint, the NCUAB alleges that Regine was an officer and director of Co-op and its wholly-owned subsidiaries, Park Place Holding and Park Realty. In Count I, the NCUAB alleges that defendants Cinquegrano and Anthony Rosciti purchased the Moosehorn Property from Park Realty in 1987 for $340,000, which was allegedly well below its fair market value; after the property was conveyed for no consideration to Henry Rosciti and Cinquegrano, they obtained a loan for $485,000, to be secured by a mortgage on the property; and Regine ultimately became a co-owner of the property for no consideration. If supported by proof, these alleged facts would support a claim for breach of fiduciary duty. *NCUAB v. Regine*, 749 F.Supp. at 413–14.

The plaintiff has provided sufficient evidence at least to create a dispute over these material facts. Regine admits his fiduciary position in Co-op and its subsidiaries. The Affidavit of William Coyle gives evidence that the true market value of the Moosehorn Property was about 35% higher than the price Park Realty accepted in 1987. The subsequent $485,000 loan and mortgage are undisputed. And Regine became a record owner of the Moosehorn Property in March 1989. This evidence and the inferences to be drawn from it support the NCUAB's allegation that Regine breached his fiduciary obligations to Co-op, Park Place Holding, and Park Realty.

Much of the same evidence that supports the NCUAB's breach of fiduciary duty claim against Regine also supports the negligence count against him. Therefore, if the NCUAB does not succeed on its claim that Regine harmed Co-op and its subsidiaries through a breach of his fiduciary duties, the NCUAB may still be able to prove that he was negligent as a bank officer and thus injured Co-op and its subsidiaries. Therefore, Regine is not entitled to summary judgment as a matter of law on counts II and VIII.

Rhode Island law, however, does not recognize more than one degree of negligence. *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F.Supp. 101, 104 (D.R.I.1991); *Corrigan v. Dun & Bradstreet, Inc.*, 91 F.Supp. 424, 426 (D.R.I.1950). The recklessness claim against Regine, count IX, does not state a cause of action different from the negligence claim. Therefore, Regine is entitled to summary judgment on count IX.

### C. The Fraud Claims

#### 1. Regine

If proved, the allegations set forth in count I, discussed immediately above, would also support a fraud claim against Regine, because breach of a fiduciary duty amounts to constructive fraud in Rhode Island. *Matarese v. Calise*, 111 R.I. 551, 564, 305 A.2d 112, 119 (1973); *see also NCUAB v. Regine*, 749 F.Supp. at 412.

Therefore, Regine is not entitled to summary judgment as a matter of law on count I.

## 2. Cinquegrano

 The fraud claim against Cinquegrano requires greater proof than the claim against Regine, because Cinquegrano had no fiduciary obligations to Co-op or its subsidiaries. In Rhode Island, common law fraud has four elements: (1) a false or misleading statement of material fact that was (2) known by the defendant to be false and (3) made with intent to deceive, (4) upon which the plaintiff relies to its detriment. *B.S. Int'l Ltd. v. Licht*, 696 F.Supp. 813, 827 (D.R.I.1988); *McGovern v. Crossley*, 477 A.2d 101, 103 (R.I.1984); *Halpert v. Rosenthal*, 107 R.I. 406, 412, 267 A.2d 730, 733 (1970); *Cliftex Clothing Co. v. DiSanto*, 88 R.I. 338, 344, 148 A.2d 273, 275–76 (1959). Fraud can be grounded in concealment. *Holmes v. Bateson*, 434 F.Supp. 1365, 1387 (D.R.I.1977), *aff'd*, 583 F.2d 542 (1st Cir.1978).

 Plaintiff alleges that Cinquegrano's fraudulent representation was his concealment in 1987 of his prior relationship with Regine, a director of Co-op and Park Realty. The plaintiff, however, has not met its burden of producing evidence that Co-op relied to its detriment on Cinquegrano's alleged concealment of the prior relationship. The NCUAB's Statement of Disputed Facts points to evidence of an association among the defendants, Regine's ownership interest in the Moosehorn Property, and the bad deal that Co-op received in the transaction. But the plaintiff has not directed this Court to evidence of reliance by Co-op or its subsidiaries on Cinquegrano's representations. Moreover, it is unclear to the Court whether Cinquegrano made any false representations to Co-op or its subsidiaries. In Rhode Island, "there must be a

showing not only of the falsity of defendant's representation but also that plaintiff was induced to rely upon it and was thereby injured." *Cliftex Clothing*, 88 R.I. at 344; 148 A.2d at 276. These elements are lacking. Accordingly, Cinquegrano's motion for summary judgment with respect to count I, the fraud claim, is granted.

## D. *The Rhode Island Racketeering Claims*

 Under R.I.Gen.L. § 7–15–2, the plaintiff must prove that the defendants (1) committed a racketeering activity and (2) invested the proceeds in the establishment, conduct, or operation of an enterprise. *NCUAB v. Regine*, 749 F.Supp. at 412. The fraudulent scheme to obtain the Moosehorn Property, as alleged in the Amended Complaint, would be larceny, a racketeering activity. *Id.* at 413; R.I.Gen.L. § 7–15–1 (Michie 1985); *see also* Amended Complaint, para. 77.

In this case, the only possible form of larceny committed is larceny by false pretenses or by trick. In Rhode Island, "[e]very person who shall obtain from another designedly, by any false pretense or pretenses, any money, goods, wares, or other property, with intent to cheat or defraud," will be deemed guilty of larceny. R.I.Gen.L. § 11–41–4 (Michie 1981); *NCUAB v. Regine*, 749 F.Supp. at 413. Larceny by false pretenses is a species of fraud.

The words of the statute determine the elements of this crime. Larceny by false pretenses requires proof of several elements. First, the defendant must obtain property from another person or entity.[3] Second, the defendant must make a false representation.[4] Third, the victim must actually rely on the false representation in surrendering the property.[5] Finally, the

---

**3.** "Every person who shall obtain from another . . . any money, goods, wares, or other property. . . ." R.I.Gen.L. § 11–41–4 (1981).

**4.** ". . . by any false pretense or pretenses. . . ." *Id.*

**5.** ". . . who shall obtain . . . *by* any false pretense or pretenses. . . ." *Id.* (emphasis added); *see*

*also People v. Lorenzo*, 64 Cal.App.3d Supp. 43, 46–47, 135 Cal.Rptr. 337, 339 (1976) ("It is basic law that reliance on a false representation is an element of fraud; since fraudulent means are required in order for larceny by trick to be committed, a lack of such reliance must be equally fatal to the commission of that offense").

statute requires proof of the defendant's intent to cheat or defraud.[6]

The alleged facts supporting the NCUAB's claim against Regine for breach of fiduciary obligations would also support a larceny claim against him. There is evidence that Regine took an interest in the Moosehorn Property after participating in Co-op's decision to sell the property at a bargain price to the other defendants. There is also evidence that Co-op and its subsidiaries relied on his recommendations and representations. The intent to cheat may be inferred from the circumstances. The first element of racketeering, participation in a racketeering activity, is satisfied for Regine.

The plaintiff has produced no evidence of detrimental reliance on Cinquegrano's representations, however, and so the fraud count against him will be dismissed. Because the Court has seen no evidence of reliance, the plaintiff also cannot prove that Cinquegrano committed larceny by false pretenses. Accordingly, the remaining state racketeering count against Cinquegrano, count XI, cannot survive Cinquegrano's motion for summary judgment.

Racketeering also requires the use or investment of income or proceeds derived from racketeering in the establishment, conduct, or operation of an enterprise. R.I.Gen.L. § 7–15–2(a) (Michie 1985); *State v. Brown*, 486 A.2d 595, 599 (R.I.1985). According to the theory advanced by the plaintiff, the individual defendants invested the proceeds of the Moosehorn Property deal in Barge In, Inc. The plaintiff has identified evidence to support this theory. *See* H. Rosciti Depo., pp. 60–61; Regine Depo. I pp. 131–32, 146–47. Therefore, the plaintiff has met its burden of producing evidence to support the "enterprise" element of racketeering under the Rhode Island statute.

Therefore, Regine's motion for summary judgment on count XI of the Amended Complaint must be denied. Cinquegrano's identical motion, as noted in the preceding paragraph, is granted.

## V. REGINE'S AND CINQUEGRANO'S MOTIONS FOR SUMMARY JUDGMENT IN FAVOR OF THEIR COUNTERCLAIMS

Finally, Regine and Cinquegrano have moved for summary judgment in favor of their counterclaims. At the very least, there is a genuine dispute over whether RICCU would have actually made the crucial $1.1 million loan to the defendants had Fairlawn given the requested assurance. *See* Letter from J. Lanfredi to A. Regine, H. Rosciti, & M. Cinquegrano, Dec. 6, 1989. But further, because this Court dismisses the counterclaims of all defendants, this part of Regine's and Cinquegrano's motions must necessarily fail.

## VI. CONCLUSION

The NCUAB's motion for summary judgment on counts III, IV, V, VI, and VII of the Amended Complaint is granted. The NCUAB's motion for summary judgment on or dismissal of all counterclaims is also granted. Regine's motion for summary judgment is granted as to count IX of the Amended Complaint. The remainder of Regine's motion for summary judgment is denied. Cinquegrano's motion for summary judgment is granted as to counts I and XI of the Amended Complaint. The remainder of Cinquegrano's motion for summary judgment is denied.[7]

It is so ordered.

---

**6.** "... with intent to cheat or defraud...." R.I.Gen.L. § 11–41–4 (Michie 1981).

**7.** After this Court's ruling on the cross-motions for summary judgment, the following claims remain to be adjudicated:

*NCUAB v. Regine:* Counts I (fraud), II (breach of fiduciary duty), VIII (negligence), and XI (state RICO);
*NCUAB v. Henry Rosciti:* Counts I (fraud) and XI (state RICO);

*NCUAB v. Anthony Rosciti:* Counts I (fraud) and XI (state RICO).

Additionally, the Court must still determine the amounts owed to the plaintiff on the following claims:

*NCUAB v. H. Rosciti & Cinquegrano:* Counts III ($485,000 note) and VI ($125,000 note);
*NCUAB v. H. Rosciti, Regine, and Barge In, Inc.:* Count IV ($540,000 note);
*NCUAB v. Providence Marine Realty, Inc.:* Count V (breach of guarantee for the $540,000 note in Count IV);
*NCUAB v. A. Rosciti, Regine, and Providence Marine Realty, Inc.:* Count VII ($100,000 note).