**In the Matter of the Complaint of BAL-LARD SHIPPING CO. for Exoneration From or Limitation of Liability.**

Civ. A. No. 89–0685L.

United States District Court,
D. Rhode Island.

Jan. 13, 1993.

Thomas H. Walsh, Jr., John J. Finn, Bingham, Dana & Gould, Boston, MA, Gordon P. Cleary, Vetter & White, Providence, RI, for Ballard.

Douglas J. Rose, Providence, RI, for John Hobin, d/b/a Happy Hobin's, Roland Lapre, d/b/a Pier 5 Top of the Dock, Inc., Gregory Zeek, d/b/a Zeek's Creek Bait & Tackle Shop.

George F. McDonald, Cranston, RI, for Paiva Shellfish, Inc., Clotilde Paiva, Jose Carlos Nunes, Joaquim S. Prata.

Ralph Kinder, Armstrong & Gibbons, Providence, RI, for Recreation Partners I, d/b/a The Village Inn.

Roland B. Carpenter, North Kingstown, RI, for John P. Rutkevicz, Tiverton Shellfish Co., Inc.

Paul C. Borges, Providence, RI, for B & M Distributing, Inc.

Frederick C. Cass, Providence, RI, for Louis DiManni, d/b/a Admiral Seafood.

David B. Kaplan, Chelsea, MA, and Richard Corley, Lovett, Schefrin, Gallogly & Harnett, Providence, RI, for Robert R. Boisvert, Beach Shellfish, John McCabe II and Michael Robinson, d/b/a Bristol Marketing, Ltd., East Bay Clam & Lobster, Ken Ferrara, d/b/a Ray's Bait & Tackle, Greenwich Bay Clam, Inc., Donald C. Merrill, d/b/a Merrill Commercial Shellfishing Equipment, Antonio Giorgio, d/b/a New England Shellfish, Seven Seas Shellfish, Inc., Wells Metal Fabrication, Inc., P.F.G. Corp., d/b/a Wickford Shellfish, Norman Zwolinski, d/b/a Norman Zwolinski Shellfish Co., Ronald E. Turgeon, d/b/a Turgeon Shellfish.

Bradley L. Carter, pro se.

Michael S. Bestwick, pro se.

William G. DeConte, pro se.

## MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the motion of Ballard Shipping Co. ("Ballard") for exoneration from and dismissal of certain claims against it pursuant to Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Ballard argues that a number of individuals and entities which have filed claims against it have failed to state a claim upon which relief can be granted.[1]

---

1. The 29 claimants against whom Ballard has filed this motion to dismiss are: B & M Distributing, Inc.; Michael S. Bestwick, d/b/a Quaker Lane Bait & Canoes; Bradley L. Carter, d/b/a Carter's Seafood; William G. DeConti, d/b/a Apollo Deli; Louis DiManni, d/b/a Admiral Seafood; John Hobin, d/b/a Happy Hobin's; Roland Lapre, d/b/a Pier 5 Top of the Dock, Inc.; Paiva Shellfish, Inc.; Clotilde Paiva; Jose Carlos Nunes; Joaquim S. Prata; Recreation Partners I, d/b/a The Village Inn; John P. Rutkevicz; Tiverton Shellfish Co., Inc.; Turtle Frolic, Inc., d/b/a Gooseberry Concession; Gregory Zeek, d/b/a Zeek's Creek Bait & Tackle Shop; Robert R. Boisvert; John McCabe II and Michael Robinson, d/b/a Bristol Marketing,

This matter arises out of the grounding in Narragansett Bay of the vessel M/V WORLD PRODIGY, which was owned by Ballard. On June 23, 1989, the ship hit Brenton Reef off the coast of Newport, Rhode Island and spilled a substantial amount of its cargo of heating oil into the Bay. After several suits were filed against Ballard arising out of the incident, Ballard initiated this case by filing a verified complaint for exoneration from or limitation of liability under 46 U.S.C.App. § 183 in December, 1989. A large number of parties (almost 450) responded by filing claims for damages allegedly resulting from the oil spill.[2]

By its present motion, Ballard addresses the claims of twenty-nine claimants who allege purely economic loss arising out of the oil spill. These claimants include seafood dealers, tackle shop operators, restaurant owners and employees, a scuba equipment and canoe rental shop, and a variety of other shoreline businesses operating in the Narragansett Bay area. Although these individuals and entities do not allege any physical injury to their persons or property, they contend that the oil spill in June 1989 caused them financial harm by preventing, or at a minimum substantially decreasing, their ability to work and conduct their businesses for an extended period of time. Ballard responds that, while these persons or entities may have been harmed financially, such injuries are not cognizable under the law. For the reasons stated below, the Court agrees with Ballard's position and, thus, grants Ballard's motion for exoneration from and dismissal of these claims.

## DISCUSSION

### I. Standard For 12(b)(6) Motion

The standard guiding the Court's decision on this motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is clear. Ballard, as the moving party, bears the burden of establishing that the claims of the twenty-nine claimants, the non-moving parties, are insufficient as a matter of law. *National Credit Union Admin. Bd. v. Regine,* 795 F.Supp. 59, 62 (D.R.I.1992) (citing *Harper v. Cserr,* 544 F.2d 1121, 1122 (1st Cir.1976)). For the purpose of testing the sufficiency of the claims, the Court must view all facts and inferences in the light most favorable to the non-moving parties and must assume that all of the allegations in the complaints are true. *Paradis v. Aetna Casualty & Sur. Co.,* 796 F.Supp. 59, 61 (D.R.I.1992). The Court may grant the motion to dismiss only if it appears beyond doubt from the pleadings that the parties opposing the motion can prove no possible set of facts that would support the non-moving parties' claims for relief. *Lopez v. Bulova Watch Co.,* 582 F.Supp. 755, 767 (D.R.I.1984).

### II. Maritime Law

Determining which law applies in this case is crucial to testing the sufficiency of the claims. All parties agree that the oil spill occurring in Narraganset Bay constitutes a maritime tort and is within this Court's admiralty jurisdiction. Both the locality and operation of the ship when it went aground dictate this result. *See East River Steamship Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 863–64, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986). The tort occurred in navigable waters and, since the vessel was engaging in maritime commerce when it spilled the oil, the wrong bears " 'a significant relationship to traditional maritime activity.' " *Id.* (quoting *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972)). The Court will thus apply substantive admiralty law, statutory

Ltd.; Ken Ferrara, d/b/a Ray's Bait & Tackle; Greenwich Bay Clam, Inc.; Donald C. Merrill, d/b/a Merrill Commercial Shellfishing Equipment; Antonio Giorgio, d/b/a New England Shellfish; Norman Zwolinski, d/b/a Norman Zwolinski Shellfish Co.; Seven Seas Shellfish, Inc.; P.F.G. Corp., d/b/a Wickford Shellfish; Wells Metal Fabrication, Inc.; Ronald E. Turgeon, d/b/a Turgeon Shellfish; Beach Shellfish; and East Bay Clam & Lobster.

**2.** Additional procedural background is set forth in *In re Complaint of Ballard Shipping Co.,* 752 F.Supp. 546, 547 (D.R.I.1990) and *In re Complaint of Ballard Shipping Co.,* 772 F.Supp. 721 (D.R.I.1991).

as well as that developed by the judiciary. *Id.* 476 U.S. at 864, 106 S.Ct. at 2299.

Courts in admiralty have traditionally applied judge-made maritime law to tort claims resulting from oil spills. This general maritime law has barred claims for purely economic losses sounding in tort since Justice Holmes established such rule in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 309, 48 S.Ct. 134, 135, 72 L.Ed. 290 (1927) (although dry dock's negligent damaging of ship's propeller prevented plaintiff, who had chartered the ship, from using the ship for two weeks, plaintiff, who had suffered no physical injury to itself or to its property, had no cause of action for the purely financial injury it sustained).

Claimants concede that such a rule exists, however, they contend that the rule does not apply in this case. First, they argue that their claims fall under an exception to *Robins Dry Dock,* either because of the nature of the harm or because of the criminal conduct engaged in by the ship's master. Second, they argue that, even if the Court concludes that their claims are not within an exception to the *Robins Dry Dock* rule, Rhode Island law, rather than general admiralty law, applies, and thus they have a cognizable claim under Rhode Island's Environmental Injury Compensation Act ("Rhode Island Act"), R.I.Gen. Laws § 46–12.3–4 (1991). In support of this theory, they claim that the Rhode Island statute is a valid exercise of the state's police power that does not substantially conflict with federal law. Alternatively, they contend that general maritime law, including the *Robins Dry Dock* rule, is preempted by the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251 *et seq.* (1988), and that this federal Act permits recovery under claims made pursuant to a state statute such as Rhode Island has enacted. As discussed below, the Court finds no merit in either of the arguments advanced by these claimants.

III. *The Robins Dry Dock Rule*

Federal courts have long recognized the *Robins Dry Dock* rule denying claims in the absence of physical injury to the claimant's person or property. *See, e.g., Getty Refining & Marketing Co. v. MT Fadi B,* 766 F.2d 829 (3d Cir.1985) (followed *Robins Dry Dock* in denying recovery to operator of marine terminal which suffered purely financial damages when defendant's ship was forced to remain at terminal for several days); *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019 (5th Cir.1985) (en banc) (relied on *Robins Dry Dock* in granting summary judgment against claimants, excluding commercial fishermen, who sustained no physical damage to property as a result of chemical spill by ships into the Mississippi River), *cert. denied sub nom. White v. M/V Testbank,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); *Petitions of Kinsman Transit Co.,* 388 F.2d 821 (2d Cir.1968) (denied recovery for financial injuries suffered by ships that were prevented from moving upstream to unload cargo after defendant's ship crashed into another ship).

The First Circuit recently reconfirmed its commitment to the *Robins Dry Dock* rule in *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50 (1st Cir.1985). In *Barber Lines,* the Court affirmed the dismissal of claims by shipowners and charterers for the additional cargo discharging expenditures necessitated by defendant's negligent spilling of fuel oil into Boston Harbor. Not only did the First Circuit conclude that *Robins Dry Dock* and its progeny had created a legal line precluding recovery for strictly financial injuries, but also, after an extensive examination of the issue, it concluded that the policies underlying the rule were sound. *Id.* at 53. The Court explained that, from a practical administrative point of view, the *Robins Dry Dock* rule limiting recovery helps control the increasing costs of the tort action as a device for compensating accident victims. *Id.* at 54–55. Additionally, the bright line rule decreases both the disproportionality between liability and fault and the potentially perverse incentives that liability for purely financial harm could create. *Id.* at 55.

Despite *Barber Lines,* claimants urge this Court to adopt the reasoning espoused by the recent Fifth Circuit en banc dissent

in *Testbank,* 752 F.2d at 1035–53. The *Testbank* dissent turns away from the bright line principle of *Robins Dry Dock* in favor of the general tort principle of foreseeability. *Id.* However, like the majority of Fifth Circuit judges, the First Circuit explicitly rejected the *Testbank* dissent and the notion that a foreseeability test, rather than a bright line rule, should be applied. *Barber Lines,* 764 F.2d at 56–57. Thus, any reliance upon the *Testbank* dissent by the claimants in this case is to no avail.

A. Fishermen's Exception

■ While agreeing that *Robins Dry Dock,* if followed, generally precludes recovery for purely financial harm, the claimants emphasize the exception which some courts have carved out for commercial fishermen. *See, e.g., Union Oil Co. v. Oppen,* 501 F.2d 558, 567–71 (9th Cir.1974); *Louisiana ex rel. Guste v. M/V Testbank,* 524 F.Supp. 1170, 1173–74 (E.D.La.1981), *aff'd on other grounds, Testbank,* 752 F.2d 1019; *Pruitt v. Allied Chemical Corp.,* 523 F.Supp. 975, 981 (E.D.Va.1981); *Burgess v. M/V Tamano,* 370 F.Supp. 247, 250 (D.Me.1973), *aff'd per curiam,* 559 F.2d 1200 (1st Cir.1977). In *Oppen,* the Ninth Circuit explained that "the right of fishermen to recover their share of the prospective catch 'is no doubt a manifestation of the familiar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection.'" *Oppen,* 501 F.2d at 567 (quoting *Carbone v. Ursich, The Del Rio,* 209 F.2d 178, 182 (9th Cir.1953)). Although the First Circuit referred to this exception for fishermen in *Barber Lines,* 764 F.2d at 56, it has never based a ruling on the exception. Regardless, this Court concludes that, even if the fishermen's exception is alive and well in the First Circuit, the present claimants do not fall within its parameters.

The claimants in this instance are clearly not fishermen. Those most akin to fishermen are the seafood dealers. The dealers claim that their similarities to fishermen bring them within the fishermen's exception. Accepting the facts portrayed by those non-moving parties, as required for a

motion to dismiss, *Paradis,* 796 F.Supp. at 61, the dealers meet the shellfishermen at the dock, or sometimes out on the Bay, to buy each day's harvest directly from the boats. They act solely as the selling arm for the fishermen of Narragansett Bay. Therefore, unlike restaurants or food processors, who could conceivably continue operating by turning to alternative suppliers, the dealers rely exclusively on Narragansett Bay for their livelihood.

Nonetheless, this Court concludes that the differences between the dealers and fishermen are more compelling than the alleged similarities. The dealers are primarily commercial middlemen; their product is from the sea, but many characteristics of their job mirror those of dealers of innumerable other products. Importantly, other courts have refused to extend the exception beyond persons who work as fishermen for a living. In *Testbank,* 752 F.Supp. 1019, the Fifth Circuit explicitly rejected claims by wholesale and retail seafood enterprises not actually engaged in fishing. Similarly, in *Tamano,* 370 F.2d 247, the Court allowed claims by commercial fishermen and clam diggers but denied those by shoreline businesses whose property had not been physically injured by the oil spill. And, in *Oppen,* the Ninth Circuit stated, "[I]t must be understand that our holding in this case does not open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded by the oil spill...." *Oppen,* 501 F.2d at 570.

Even more telling in this instance, the United States District Court in California recently declared that the fishermen's exception did not include fishbrokers financially harmed as a result of an oil spill, despite the fact that "fishbrokers rely upon the resources of the sea in the same ways as the fishermen, and under California law both groups are subject to the same extensive regulation of their trade and are thereby made interconnected." *Slaven v. BP America, Inc.,* 786 F.Supp. 853, 861 (C.D.Cal.1992). This Court agrees with the *Slaven* Court that the reason underlying the exception for fishermen does not apply

to the dealers, who do not work on the high seas and thus are not "the favorites of admiralty." *Id.* This Court also agrees that the commercial interdependence between the fishermen and the dealers does not turn the latter into the former and "is not a sufficient basis for treating them identically." *Id.*

Obviously, the other claimants whose similarities to fishermen are even more attenuated, and who occupy positions specifically held to be outside the exception for fishermen in previous cases, *see e.g., Testbank,* 752 F.2d 1019; *Tamano,* 370 F.Supp. 247, also fail to qualify under the fishermen's exception to the *Robins Dry Dock* rule.

### B. Master's Criminal Conduct

■ Three claimants, Gregory Zeek, John Hobin, and Roland Lapre, argue that the criminal negligence of Captain Georgudis, the master of the M/V WORLD PRODIGY on June 23, 1989, renders the *Robins Dry Dock* limitation inapplicable in this instance.[3] They characterize *Barber Lines* as inapposite because it involves only "simple negligence," and contend that the traditional tort concept of foreseeability should operate when claimants suffer purely financial harm as a result of criminal conduct.

The Court is not persuaded by this reasoning. The claimants cite no cases in support of their proposition. The Court does not believe that maritime tort law principles, such as the *Robins Dry Dock* rule, should be distorted or cease to operate because the criminal law imposes penalties on particular negligent behavior. As the federal law now deems criminal virtually all negligence resulting in an oil spill in navigable waters, *see e.g.,* The Refuse Act, 33 U.S.C. § 407 (1992); FWPCA, 33 U.S.C. § 1319 (1992), adopting the claimants' position would transform the *Robins Dry Dock* rule into a meaningless assertion. This Court does not believe that Congress in-

tended that *Robins Dry Dock* be relegated to the scrap heap in this manner.

### IV. *State and Federal Legislation*

The claimants contend that even if they do not have an exception to the *Robins Dry Dock* rule into which to crawl, general maritime tort law does not apply to this case in any event. They argue that they have a cognizable claim under the recently enacted Rhode Island Environmental Injury Compensation Act, R.I.Gen.Laws § 46–12.3–1 *et seq.,* either standing alone, or in coordination with the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* and that, consequently, *Robins Dry Dock* has no application.

The Rhode Island Act assesses liability for damages caused by certain violations of Rhode Island law regarding waters and navigation, including water pollution laws, or result from the negligence of the owner, operator, or agent of the instrumentality causing the damage. R.I.Gen.Laws § 46–12.3–1. The Act enables claimants to recover for economic loss if they can "demonstrate the loss of income or diminution of profit to a person or business as a result of damage to the natural resources of the state of Rhode Island...." R.I.Gen.Laws § 46–12.3–4(a). The statute provides that, to recover for economic loss, "it shall not be necessary to prove that the loss was sustained as a result of physical injury to the person or damage to his or her property...." R.I.Gen.Laws § 46–12.3–4(b). Further, it specifically extends recovery to:

> persons engaged in commercial fishing or shellfishing and/or the processors of fish or shellfish, who can demonstrate that they have sustained a loss of income or profit as result of damage to the environment ... [and p]ersons employed by, or who operate businesses, who have sustained a loss of income or profit as a result of a decrease in the volume of

---

**3.** Following the grounding, Captain Georgudis pleaded guilty in federal court to violating the Federal Water Pollution Control Act and was ordered to pay a fine of $10,000 for his role in the oil spill. He also was fined $500 and or-

dered to pay $20,000 to a victim-witness fund after he pleaded no contest in state court to charges that he violated a Rhode Island state law by entering Rhode Island waters without a local pilot.

business caused by the damage to the environment. . . .

R.I.Gen.Laws § 46–12.3–4(c).

The parties agree that, if this statute is deemed to be controlling, these claimants could have a viable claim. However, Ballard hotly contests the applicability of this Rhode Island statute to this case. Although the claimants set forth two arguments in support of applying the Rhode Island statute, as discussed below, the Court concludes that this state law plays no role in this case.[4]

### A. State Police Power

■ The claimants argue that the Rhode Island law applies because it constitutes a valid exercise of the state's police power and does not conflict substantially with federal law. They point to *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973), in which the Supreme Court relied on similar reasoning to uphold a Florida statute governing water pollution. The claimants contend that the Rhode Island Act is analogous to the Florida statute at issue in *Askew*, and suggest that, as the Supreme Court refused to enjoin the application of the Florida law, this Court should allow the Rhode Island statute to be effective in this case.

After reviewing their arguments, this Court determines that the claimants' reliance on *Askew* is misplaced. As there is a clear conflict between the Rhode Island Act and the *Robins Dry Dock* rule, the claimants have either misunderstood the requirement in *Askew* that the state law not conflict with federal law, 411 U.S. at 341, 93 S.Ct. at 1600, or mischaracterized settled maritime law. Consequently, rather than

supporting their contention that the Rhode Island Act applies in this case, *Askew* dictates that the state law must give way to the established maritime principle espoused in *Robins Dry Dock.*

The Supreme Court in *Askew* reversed the lower court's ruling that the Florida Oil Spill Prevention and Pollution Control Act (the "Florida Act") unconstitutionally intruded into the exclusive federal domain of substantive admiralty law. *Id.* 411 U.S. at 344, 93 S.Ct. at 1601. In so doing, it declared that there is no constitutional impediment to states exercising their police power over maritime activities concurrently with the Federal Government, and announced that states could legislate in the area of water pollution. *Id.* at 328, 93 S.Ct. at 1594. However, the Court repeatedly emphasized that state laws enacted in that sphere cannot conflict with federal law. *Id.* at 337–41, 93 S.Ct. at 1599–1600. Although the circumstances in *Askew* did not require the Supreme Court to consider whether the Florida Act conflicted with general maritime law, the Court clearly indicated that state laws cannot be controlling if they conflict with either federal statutory or judge-made maritime law. The Court, quoting from *Just v. Chambers*, 312 U.S. 383, 388, 61 S.Ct. 687, 691, 85 L.Ed. 903 (1941), emphasized that a state may modify or supplement maritime law, "provided that the state action is not hostile 'to the characteristic features of the maritime law or inconsistent with federal legislation.'" *Askew*, 411 U.S. at 338, 93 S.Ct. at 1598.

The case now before this Court presents a different set of circumstances than those before the Supreme Court in *Askew*. It is true that the Rhode Island Act parallels the

---

**4.** Ballard has indicated that for purposes of this motion only, it does not contest that this 1991 Rhode Island statute can be applied retroactively to the 1989 grounding of the M/V WORLD PRODIGY. The Court, therefore, does not address this issue of the retroactive application of Rhode Island Gen.Law § 46–12.3–1 *et seq.* (1991).

Additionally, a finding that the Rhode Island statute is inapplicable in this case does not preclude the law from applying in future cases. Congress's recent enactment of the Oil Pollution

Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, which allows recovery for certain damages resulting from oil spills, including "loss of profits or impairment of earning capacity," 33 U.S.C. § 2702(b)(2), may permit the application of the economic harm provisions of the Rhode Island statute in actions arising out of incidents occurring after August 18, 1990, the effective date of the federal statute. The OPA, however, does not apply to this action, which arises out of an oil spill occurring in 1989.

Florida Act in certain regards; both assess liability for oil spills in state waters, provide for recovery by the state for cleanup expenses and for damages resulting from injury to others. *Id.* at 331, 93 S.Ct. at 1595; R.I.Gen.Laws § 46–12.3–2. However, here, the claimants rely on a provision of the Rhode Island Act that, unlike any in the Florida Act, specifically allows for recovery for purely economic injury and, thus, is squarely in conflict with an established rule of maritime law. In the face of such conflict, the state law must yield.

### B. FWPCA and Preemption of Robins Dry Dock

The claimants next turn to the Federal Water Pollution Control Act for assistance. The FWPCA is a comprehensive Act administered by the Environmental Protection Agency ("EPA") aimed at the prevention of water pollution through the establishment of research programs, grants for construction of treatment works, enactment of standards, and requirement of permits and licenses. 33 U.S.C. § 1251 *et seq.* Most relevant to this case, the Act includes the Oil and Hazardous Substance Liability section, 33 U.S.C. § 1321, which, *inter alia,* prohibits the harmful discharge of oil into navigable waters and assesses liability for cleanup costs expended by the United States in removing spilled oil.

The claimants concede that the FWPCA does not directly authorize recovery on claims otherwise barred by *Robins Dry Dock.* However, they suggest that the federal statute combines with the Rhode Island Act to allow such recovery indirectly. They first claim that the FWPCA, as a comprehensive federal act governing water pollution, displaces the general maritime law affecting that area, including the rule of *Robins Dry Dock.* Second, they contend that the FWPCA invites states to supplement it with local water pollution laws that do not conflict with the federal statute. They argue that the Rhode Island Act constitutes such a valid supplement. Since this Court disagrees with the key assumptions relied on by the claimants at each step of their argument, the Court concludes that the FWPCA does not allow the

Rhode Island ·Act to supplant general federal maritime law and the *Robins Dry Dock* rule as the controlling law in this case.

### 1. *Preemption by the FWPCA*

■ The claimants argue that, although not explicitly stated in the Act, the FWPCA displaces all judge-made maritime law bearing on water pollution. The Court recognizes that federal statutes can preempt general maritime rules, and that, when Congress addresses a topic previously governed by federal common law, there is a presumption of statutory preemption of federal common law. *In re Complaint of Oswego Barge Corp.,* 664 F.2d 327, 335 (2d Cir.1981). However, because of the federal judiciary's expansive role in developing uniform maritime law, courts apply the presumption less forcefully to judge-made maritime law than to non-maritime federal common law. *Id.* at 336. The presumption also carries less weight when courts are considering whether Congress intended to displace " 'long-established and familiar principles' of 'the common law or the general maritime law,' " such as the *Robins Dry Dock* rule. *Id.* at 339 (quoting *Ibrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)).

■ With the presumptions in mind, the proper test to determine whether a federal Act has displaced a particular area of general maritime law is whether the legislation "[speaks] directly to [the] question," *City of Milwaukee v. Illinois,* 451 U.S. 304, 315, 101 S.Ct. 1784, 1791, 68 L.Ed.2d 114 (1981), or whether Congress "intended to occupy the field," *Chevron U.S.A. Inc. v. Hammond,* 726 F.2d 483, 486 (9th Cir.1984), *cert. den. sub nom. Chevron U.S.A., Inc. v. Sheffield,* 471 U.S. 1140, 105 S.Ct. 2686, 86 L.Ed.2d 703 (1985). In the absence of express preemption language, the court must "assess the scope of the legislation and whether the legislative scheme addresses the problem formerly governed by federal common law." *Gardiner v. Sea–Land Service, Inc.,* 786 F.2d 943, 947 (9th

Cir.) (citing *Milwaukee*, 451 U.S. at 315 n. 8, 101 S.Ct. at 1792 n. 8), *cert. den.*, 479 U.S. 924, 107 S.Ct. 331, 93 L.Ed.2d 303 (1986).

▋ In this case, to support their claim that the FWPCA abrogates general maritime law regarding water pollution, including the *Robins Dry Dock* rule, the claimants rely on *Conner v. Aerovox, Inc.*, 730 F.2d 835 (1st Cir.1984) (affirmed dismissal of maritime tort claims based on a nuisance theory brought by commercial fishermen alleging damage to fishing grounds from discharges of toxic substances into navigable waters in southern Massachusetts), *cert. den.*, 470 U.S. 1050, 105 S.Ct. 1747, 84 L.Ed.2d 812 (1985). Although the First Circuit held in *Conner* that the FWPCA preempted certain maritime tort claims, the claimants read the case too broadly. In *Conner*, the Court held that the FWPCA preempted maritime law "to the extent it would afford a damage remedy for pollution of navigable waters *based on a common-law nuisance theory*." *Id.* at 836–37 (emphasis added). The First Circuit, which specifically noted, "We do not consider ... whether a negligence action for injuries due to water pollution still sounds in maritime tort after FWPCA's enactment," *Id.* at 838 n. 6, did not determine that the FWPCA displaced all judge-made maritime law regarding water pollution. Similarly, cases upon which *Conner* was based also limited their holdings that the FWPCA preempted general maritime law to claims based on the nuisance theory. *See Milwaukee*, 451 U.S. 304, 101 S.Ct. 1784; *Middlesex County Sewerage Authority v. National Sea Clammer Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

Nonetheless, the claimants, without providing additional reasoning, insist that the FWPCA also displaces the *Robins Dry Dock* rule. Despite the federal Act's preemption of maritime nuisance claims for damage resulting from water pollution, the Court concludes that the FWPCA does not displace all general maritime tort law regarding negligence claims for oil spills. Specifically, the Court holds that *Robins Dry Dock* as applied in this case survives the enactment of the FWPCA.[5]

Importantly, the reasoning leading courts to opine that the FWPCA preempts maritime claims based on a nuisance theory does not apply to negligence actions such as this one in which the *Robins Dry Dock* rule excludes certain economic claims. Courts which determined that nuisance claims were preempted focused on the comprehensive nature of the FWPCA in regulating the amount of harmful substances allowed in particular waters, through standards, permits, and other requirements established by the EPA. *See, e.g., Milwaukee*, 451 U.S. 304, 101 S.Ct. 1784; *National Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615. These courts found that the regulatory scheme "speaks directly to" the issue upon which claims for damages from water pollution under a theory of nuisance were based. *Id.* The Supreme Court, in *Milwaukee*, 451 U.S. at 317, 101 S.Ct. at 1792, explained:

> Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rather has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.

Further, in the same case, the Court, discussing the lower court's application of a nuisance theory, noted, "In imposing stricter effluent limitations the District Court was not 'filling a gap' in the regulatory scheme, it was simply providing a different regulatory scheme." 451 U.S. at 324 n. 18, 101 S.Ct. at 1796 n. 18.

The claimants have not suggested, and the Court has not found, that anything in the language or history of the FWPCA suggests that it "speaks directly to" rules limiting who can recover damages in a mar-

---

**5.** As stated in footnote 3, by its decision, the Court makes no determination whether *Robins* *Dry Dock* survives the enactment of the OPA.

itime negligence tort claim.[6] The Act evidences no intent to provide recovery for private parties who were not previously allowed to collect damages. Unlike nuisance theory concepts, the *Robins Dry Dock* rule does not require a court to assess or apply nebulous standards, and does not interfere with standards or requirements established under the FWPCA.

### 2. *State Law Supplements to FWPCA*

The claimants argue that, in addition to designing the FWPCA to preempt federal maritime law, Congress intended states to supplement the FWPCA with legislation assessing liability for oil spills, as long as the state legislation did not contradict the language of the federal Act. However, this Court reaches a different conclusion after reviewing the language and legislative history of the FWPCA, as well as cases concerning analogous federal laws in the admiralty field.

The claimants' argument that states may create oil spill liability provisions in coordination with the federal statute, even if such legislation contradicts general maritime law, is based on the Oil and Hazardous Substance Liability section of the FWPCA. The particular language upon which they focus states:

> (2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State.
>
> (3) Nothing in this section shall be construed as affecting or modifying any other existing authority of any Federal department ..., or to affect any State or local law not in conflict with this section.

33 U.S.C. § 1321(*o*)(2)–(3). However, the same section also preserves general maritime law regarding the obligations owed by owners of vessels for damages resulting from oil spills. Subsection 1321(*o*)(1) provides:

> (1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel ... to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance....

33 U.S.C. § 1321(*o*)(1). Reading these three paragraphs together, the Court concludes that this section does not delegate to states the authority to enact legislation that preempts federal maritime law. Subsection 1321(*o*) explicitly states that, despite the regulatory scheme it creates, the Oil and Hazardous Substance Liability section does not completely preempt the field regarding discharge of hazardous substances into state waters. While it thus permits state laws that do not conflict with this section, it does not, therefore, allow laws that conflict with federal maritime law. Similarly, nothing in the history of the statute, or of this section in particular, suggests that Congress intended to grant states plenary power to legislate in this area.

Cases, such as *In re Exxon Valdez*, 767 F.Supp. 1509 (D.Alaska 1991), analyzing the relationship among a federal statute, a state law, and the *Robins Dry Dock* rule, also fortify the Court's conclusion. In *Exxon Valdez*, the Court found that language in the Trans–Alaska Pipeline Authorization Act ("TAPAA"), 43 U.S.C. §§ 1651–1655 (1990), preempted the *Robins Dry Dock* rule. 767 F.Supp. at 1515. Specifically, it determined that Congress abrogated the rule by imposing strict liability for all damages up to $100 million resulting from the discharge of trans-Alaska pipeline oil, "notwithstanding the provisions of any other law." *Id.* (quoting 43 U.S.C. § 1653(c)). The Court then determined that an Alaska state law imposing unlimited strict liability for oil spills could apply until damages reached $100 million because *it did not conflict with TAPAA or Robins Dry Dock*, which had been displaced to the extent of $100 million. However, the Court conclud-

---

**6.** While the Oil and Hazardous Substances section of the FWPCA regulates recovery by the United States for funds expended in removing oil or other hazardous substances during clean-up, 33 U.S.C. § 1321, it does not provide for recovery for damages resulting from a spill.

ed that *"Robins Dry Dock* applies to the claims under the Alaska Act to the extent that damages claimed are in excess of liability imposed by TAPAA because general maritime would be the applicable law." *Id.*

Importantly, that Court determined that the plaintiffs could not support their claims that the state law preempted *Robins Dry Dock* beyond the $100 million. The Court was not persuaded by a section in TAPAA which, like FWPCA § 1321 relied on by the twenty-nine claimants in the present case, specifically stated that the federal statute did not "preclude any State from imposing additional requirements." *Id.* (quoting 43 U.S.C. § 1653(c)(9)). As this Court has done in the present case, the Alaska Court found that such language does not relieve the states from limits imposed by maritime law, but rather enables states to "enact laws in the area of strict liability with its police power so long as they are consistent with other applicable federal law." *Id.* Since the FWPCA, unlike TAPAA, contains no language suggesting that liability for damages should be applied "notwithstanding the provisions of any other law," and § 1321(*o*) does not grant states the authority to abrogate general maritime law, the FWPCA cannot assist the claimants in this case. In short, the Rhode Island statute must yield to the *Robins Dry Dock* rule.

### CONCLUSION

Consistent with the foregoing analysis, the Court concludes that the *Robins Dry Dock* rule, limiting recovery to those who have suffered physical injury to their person or property, bars the claims by the twenty-nine claimants Ballard addresses in this motion. Thus, the Court grants Ballard's motion for exoneration from and dismissal of these claims. No judgments will enter until all claims have been resolved in this proceeding.

It is so Ordered.