899 F.Supp. 50 (1995)
UNITED STATES of America, Plaintiff,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of Eastland Savings Bank, and Allan M. Shine, as Receiver of Budlong Manufacturing Co., Inc., Defendants.
Civ. A. No. 93-621L.
United States District Court, D. Rhode Island.
September 27, 1995.
*51 *52 Everett C. Sammartino, Assistant U.S. Attorney, Providence, RI, Charles J. Cannon, U.S. Dept. Of Justice Tax Division, Washington, DC, for plaintiff.
Joseph M. DiOrio, Hickley, Allen & Snyder, Providence, RI, Jonathan W. Fitch, Sally & Fitch, Providence, RI for F.D.I.C.
John T. Walsh, Jr., Higgins, Cavanaugh & Cooney, Providence, RI, for Receiver, Allan M. Shine.

DECISION AND ORDER
LAGUEUX, Chief Judge.
This matter is before the Court on motions filed by both defendants to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6). Defendants, Federal Deposit Insurance Corporation ("FDIC") and Allan M. Shine ("Shine"), seek to dismiss the claims brought by the United States on behalf of the Internal Revenue Service ("IRS") to recover a capital gains tax generated by the sale of corporate property in a state court receivership. For the reasons expressed below, defendants' motions are granted.

I. Facts
On August 12, 1988, Budlong Manufacturing Co., Inc. ("Budlong") was petitioned into receivership in the Providence County Superior Court in the case of Southern Industries of Clover, Ltd. v. Budlong Manufacturing, Co., Inc. (Case no. 88-3826). Shine was appointed Temporary Receiver of Budlong on August 18, 1988, and his appointment was made permanent on September 9, 1988.
Budlong's two largest creditors were Eastland Savings Bank ("ESB") and Eastland Bank ("EB"). They were both secured. ESB held a first mortgage on and first security interest in Budlong's real and personal property located at 564 Pontiac Avenue, Cranston, Rhode Island pursuant to a Mortgage, Security Agreement and Assignment of Leases and Rents dated April 30, 1985. The amount secured by ESB's mortgage lien was approximately $652,000.00. EB held a first security interest in all of Budlong's remaining assets, including its accounts receivable, inventory, equipment, machinery, other personal property, and all proceeds. These liens were created by a Security Agreement dated May 16, 1986. The amount secured was over $1,100,000.00.
On October 17, 1988, the Superior Court allowed in full the secured claims of ESB and EB. In addition, the Court established the priority of their liens on Budlong's real and personal property and other assets.
*53 Following Superior Court orders dated October 18, 1988; March 30, 1988; and December 27, 1989; Shine managed a series of sales of Budlong's property. From the sales and the collection of other sums due Budlong, Shine acquired $1,972,849.44. From these funds, he distributed $1,818,261.05 to ESB and EB to pay their claims. The remaining funds (in excess of $150,000.00) were used to pay the expenses incurred in making the sales and collecting the amounts due the receivership, such as auctioneer fees, environmental site survey costs, accounting expenses, appraisal fees, and Shine's fee for acting as Receiver.
After Shine oversaw the sale of Budlong's property, he filed Budlong's final federal income tax return. On that return, Shine reported a capital gains tax liability owed by Budlong in the amount of $403,030.00 resulting from the sale of its assets. Shine, however, did not schedule or pay this tax liability. The United States points out that Shine failed even to mention this capital gains tax liability in his First and Final Report filed with the Superior Court on July 16, 1990.
On July 23, 1990, Shine received a statement from the IRS of Taxes Due as an Expense of Administration of an estate, including a capital gains tax of $403,030.00, interest of $25,019.25, and a penalty of $22,166.65. Shine filed an Objection to this statement in Superior Court on August 3, 1990.
The Superior Court conducted a hearing on the Receiver's First and Final Report on October 3, 1990. The attorney representing the IRS knew about the hearing but did not attend. On October 29, 1990, the Court entered an order approving Shine's First and Final Report. In addition, the Superior Court expressly approved Shine's recommendations as to the amount of each claim, directed the disbursement of certain funds in Shine's possession, authorized Shine to abandon all Budlong's books and records, discharged Shine and cancelled his bond, and dissolved Budlong's corporate status.
On March 9, 1991, the United States, on behalf of the IRS, moved to vacate the Superior Court's order of October 29, 1990, which approved the Receiver's First and Final Report. ESB and EB filed an opposition to this motion. The Superior Court held a hearing on April 10, 1991, and issued an order on May 22, 1991, vacating the order of October 29, 1990. In addition, it required Shine to produce certain documents relating to the sales of Budlong's property and the claims of Budlong's creditors.
Following this proceeding, the United States filed three motions: (1) a Motion for a Second and Supplemental Report of the Receiver; (2) a Motion for leave to conduct Further Discovery and for Necessary Process; (3) and a Motion to Charge Eastland Bank and Eastland Savings Bank and for an Evidentiary Hearing. The Superior Court heard arguments on these Motions on August 15, 1991. On October 9, 1991, the Superior Court entered an order that granted the United States' Motion for Leave to Conduct Further Discovery, deferred ruling on the Motion to Charge and for an Evidentiary Hearing, and denied without prejudice the Motion for a Second and Supplemental Report of the Receiver.
The Budlong receivership was inactive for more than a year. Then, on December 11, 1992, the Director of the Rhode Island Department of Business Regulation petitioned ESB and EB into receivership in the Superior Court. The FDIC was appointed Receiver of both banks.
On March 12, 1993, the United States filed a proof of claim with the FDIC as ESB and EB's Receiver, for the unpaid taxes as an administrative expense in the amount of $450,215.90. This claim was filed under the administrative claims procedure set forth in 12 U.S.C. § 1821(d) (1989) of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").
The FDIC notified the United States that its claim was disallowed under 12 U.S.C. § 1821(d)(5)(D) because the United States had failed to prove its claim to the FDIC's satisfaction.[1] As a result, the United States *54 initiated this action in this Court pursuant to 12 U.S.C. § 1821(d)(6)(A) asserting that the IRS claim for the capital gains tax should be paid as an administrative expense. The United States prays that the claim be paid in full from either: 1) the funds received by ESB and EB from the sale of the collateral; or 2) the funds the FDIC holds as their Receiver. The United States' fall back position is that Shine should, at least, pay the United States a pro rata share from funds he received and used for payment of administrative expenses. Defendants contend that the Complaint fails to state a claim as a matter of law because neither had a legal obligation to pay the capital gains tax in the circumstances of this case.

II. Standard For Decision
When deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept the plaintiff's allegations as true. In re Ballard Shipping Co., 810 F.Supp. 359, 361 (D.R.I.1990), aff'd. in part, rev'd. in part, 32 F.3d 623 (1st Cir.1994). The court may only grant a motion to dismiss if the plaintiff cannot prove any facts supporting its claim for relief. Rockwell v. Cape Cod Hospital, 26 F.3d 254, 255 (1st Cir.1994); Morgan v. Ellerthorpe, 785 F.Supp. 295, 299 (D.R.I.1992). The defendant must show that the plaintiff's claim is insufficient as a matter of law. National Credit Union Admin. Bd. v. Regine, 795 F.Supp. 59, 62 (D.R.I.1992). In short, the court, viewing the complaint in the light most favorable to the plaintiff and resolving every doubt in its favor, must decide whether the allegations set forth any valid claim for relief. 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (1990).

III. Analysis
The above stated facts are undisputed. There is only one legal issue presented and it focuses on the priority of the payment of claims in the Budlong receivership. The United States contends that the capital gains tax generated by the sale of Budlong's assets constitutes an operating expense of the receivership analogous to those enumerated by § 506(c) of the Bankruptcy Code, 11 U.S.C. §§ 501-510 (1988), and therefore should have been paid by Shine as an administrative expense. Defendants FDIC and Shine argue that the capital gains tax generated by the sale of Budlong's assets is instead a general administrative expense, analogous to those enumerated in § 503(b)(1)(B) of the Bankruptcy Code and was not paid by Shine as Receiver because it was an inferior claim and no funds were available to pay it.
Of course, it is Rhode Island receivership law that applies to this case. Therefore, the question more precisely is whether, as a matter of Rhode Island law, a capital gains tax generated from the sale of receivership property is an operating expense of the receivership to be deducted from the secured creditors' collateral proceeds, or a general administrative expense to be paid from the general funds of the receivership.
Rhode Island has no statute that sets forth the priority of claims in receivership proceedings. As a result, Rhode Island courts deciding issues in this area frequently look to federal bankruptcy law for guidance. Leonard Levin Co. v. Star Jewelry Co., Inc., 54 R.I. 465, 175 A. 651, 653 (1934). Federal bankruptcy law provides that if the property managed by the receiver is sold to pay debts, the proceeds of the sale are used first to satisfy valid liens on the property, next for any exemptions the debtor may claim, and finally to pay claims enumerated in 11 U.S.C. § 726. In re Lambdin, 33 B.R. 11, 13 (Bankr.M.D.Tenn.1983). Establishing priority of claims is necessary because if the funds are insufficient to pay all claims, some claims must remain unsatisfied. Id.
Pre-petition and post-petition taxes enjoy different priority positions. Pre-petition taxes are debts incurred by the insolvent company prior to the appointment of the receiver. As such, pre-petition taxes have the same priority as any company debt (which is really no priority at all). In re Commercial Ins. Co., 20 R.I. 7, 36 A. 930 (1897). On the other hand, post-petition taxes accrue during the receivership. Receivers are obligated to pay taxes which fall due during the receivership, but "[t]his is not because such taxes are debts of the insolvent or the trust estate or because the receivers *55 have assumed the obligations of the mortgagor to pay taxes upon the mortgaged premises, but because the receivers are operating the property, and current taxes are to be regarded as ordinary expenses of operation." Hennepin County, Minn. v. M.W. Savage Factories, Inc., 83 F.2d 453, 455 (8th Cir. 1936) cert. denied 299 U.S. 555, 57 S.Ct. 16, 81 L.Ed. 408 (1936). It is widely recognized that taxes that become due during administration of a receivership are operating expenses for which the receiver is liable. See e.g. Holywell Corp. v. Smith, 503 U.S. 47, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992); Prudential Ins. Co. of America v. Liberdar Holding Corp., 74 F.2d 50 (2d Cir.1934); Central Vermont Ry. Co. v. Marsch, 59 F.2d 59 (1st Cir.1932); MacGregor v. Johnson-Cowdin-Emmerich, Inc., 39 F.2d 574 (2d Cir.1930). As the Court observed in MacGregor, "The taxes accruing after the receivers entered are in a different position.... [T]he taxes, which were a condition upon their continued occupation, were as much a part of their expenses as heat, custody or current upkeep." 39 F.2d at 576.
Within the larger category of operating expenses both federal bankruptcy law and Rhode Island case law recognize two separate sub-categories: 1) expenses that directly benefitted the secured creditors; and 2) general administrative expenses. Bankruptcy law assigns different priorities to these two type of expenses.
Administrative expenses that benefitted the secured creditors are chargeable to the collateral under bankruptcy law pursuant to 11 U.S.C. § 506(c) which provides: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim." In other words, only operating expenses of the receivership which benefitted the secured creditor may be paid from the secured creditor's collateral. Typical costs allowed by courts include "appraisal fees, auctioneer fees, moving expenses, maintenance and repair costs, and advertising costs." In re Swann, 149 B.R. 137, 143 (Bankr.D.S.D.1993). These costs are justified because they are expended to protect or preserve the property. 75 C.J.S. Receivers § 293(j) (1952). In addition, the claimant must show that the cost is a valid expense under § 506(c). The Court in the case of In re Cascade Hydraulics and Utility Service, Inc., 815 F.2d 546, 548 (9th Cir.1987), outlined the criteria that the claimant must meet in order to fall into that category. The expense has to be: 1) reasonable; 2) necessary; and 3) beneficial to the secured creditor. Id.
The difference between a § 506(c) expense and a § 503(b)(1)(B) expense is that bankruptcy law denominates the latter as a general administrative expense. As the Bankruptcy Code provides, "After notice and a hearing, there shall be allowed, administrative expenses ... including ... any tax ... incurred by the estate; except a tax of a kind specified in section 507(a)(7) of this title" 11 U.S.C. § 503(b)(1)(B) (1988). That means that all administrative expenses not covered by § 506(c) are to be paid out of the general funds of the estate and not from the proceeds of the secured creditor's collateral.
Under both federal bankruptcy law and Rhode Island case law, the touchstone for determining whether an operating expense of a receivership may be deducted from the proceeds of the secured creditor's collateral is whether the expense conferred a direct benefit upon the secured creditor. If a direct benefit was conferred, the expense may be deducted from the proceeds of the collateral. If no direct benefit was conferred, the expense is payable only from the other funds collected by the receiver or trustee. The IRS's claim to the capital gains tax here constitutes an expense that conferred neither a benefit nor an advantage to either ESB or EB. Therefore, it was not payable out of the proceeds of their collateral. It is only payable from the general funds of the receivership. Because there were no such funds, the tax never became payable by the Receiver.
The priority for payment of claims is that § 506(c) expenses or operating expenses that benefitted the creditor are paid first out of the proceeds of the sale, before a secured creditor is paid. Swann, *56 149 B.R. at 146. Then, after all § 506(c) expenses and secured claims are satisfied, the priority of remaining claims is established by § 507. 11 U.S.C. § 726 (1988). The administrative expenses enumerated in § 507(a)(1), including § 503(b)(1)(B) taxes, are subordinate to § 506(c) expenses and are paid from general funds, not from the proceeds of the secured collateral.
The United States makes two arguments in an effort to persuade the Court that the capital gains tax is a § 506(c) expense and, therefore, must be paid from the proceeds of collateral. The first argument is that since EB and ESB benefitted from the sale of the real property, their secured collateral should be used to pay the tax. The United States points out that with the exception of the administrative expenses incurred by the Receiver, ESB and EB were the only claimants to receive proceeds from the sales. While ESB and EB did receive the benefit of having their claims satisfied, the United States misses the point entirely. The issue is whether the capital gains tax benefitted the secured creditors. The United States cannot demonstrate how the incurring of this tax liability fulfilled the third prong of the Cascade test, i.e., that the tax "directly protect[ed] and preserve[d] the collateral." Cascade, 815 F.2d at 548 (citations omitted).
Furthermore, Congress clearly did not intend to include a post-petition capital gains tax within § 506(c). As the Court noted in an analogous context in In re Parr Meadows Racing Ass'n., Inc., 92 B.R. 30 (E.D.N.Y.1988) aff'd in part, rev'd in part, 880 F.2d 1540 (2nd Cir.1989):
Section 506(c) was not intended to encompass ordinary administrative expenses that are attributable to the general operation and dissolution of an estate in bankruptcy. Rather, it was designed to extract from a particular asset the cost of preserving or disposing of that asset. The trustee's payment of real property taxes ... are used, in part, to fund local fire, police, and road maintenance departments, which provide protection to the secured property against vandalism and fire, and ensure that the adjoining road is kept in good condition. This indirect benefit, however, is insufficient to bring these post-petition property taxes within the scope of § 506(c).
92 B.R. at 35-36. Obviously, a capital gains tax similarly does not benefit the secured creditors directly. Therefore, as with the real property taxes in Parr Meadows, the IRS claim for the capital gains tax here does not fall within the narrow realm of § 506(c). Instead, such tax is a § 503(b)(1)(B) expense.
The United States' second argument is that the secured creditors consented to the payment of the tax because they did not object to the appointment of a receiver or the sale of the property. Therefore, it contends that the tax should be deducted from the funds produced by the Receiver's sales. "Consent, however, should not be implied merely from a creditor's acquiescence" Swann, 149 B.R. at 144. While courts recognize that a creditor's consent to appointment of a receiver may create liability for the receiver's expenses that may be deducted from the creditor's proceeds of collateral, this reasoning has never been extended to include a capital gains tax. Moreover, once a receiver is appointed, the sale of assets is conducted independent of the creditors. The receiver is "act[ing] on the authority of the court and for the interest of the general creditors, not on the authority of the secured creditors and for their particular interests." Id. at 143 (citing Matter of Saybrook Mfg. Co., Inc., 130 B.R. 1013, 1021 (Bankr.M.D.Ga.1991)). Therefore, Shine in this case was not acting with the consent of ESB and EB, but instead on authority of the Superior Court for the benefit of all the creditors when he sold the receivership property even though it was all encumbered.
Many courts have held that a capital gains tax constitutes a § 503(b) expense. In the case of In re Lambdin, 33 B.R. 11 (Bankr. M.D.Tenn.1983), the Court, considering the estate's liability for a capital gains tax generated by the trustee's sale of the property, noted, "[t]his type of post-petition tax is classified as an administrative expense under 11 U.S.C. § 503(b)(1)(B) ... and has a first priority in payment from property of the estate, along with all other administrative expenses, pursuant to 11 U.S.C. § 507(a)(1)." Id. at 12 (footnotes omitted).
*57 The reasoning in Lambdin was adopted by the Rhode Island Bankruptcy Court in In re Duby, 98 B.R. 126 (Bankr.D.R.I.1989). The issue in Duby was whether a capital gains tax arising from a trustee's sale of property was a § 507(a)(7)(A)(iii) expense or whether it was a § 503(b) expense. After considering the "sparse case law" on the issue, the Court concluded, "[T]he legislative history of § 503(b) makes clear that capital gains taxes are obligations incurred by the estate, and constitute administrative expenses which have first priority status under § 507(a)(1)." Id. at 127.
This point was firmly reiterated in In re Swann. 149 B.R. 137. The Swann Court looked to Duby when considering the priority position of a capital gains tax incurred through the sale of the collateral property. Id. at 144. The Court observed, "As to the characterization of the IRS tax claim, case law, legislative history, and the statute itself make it clear that the tax liability incurred by this estate due to the Trustee's sale of real property is not a Section 506(c) expense, but, rather, an administrative expense pursuant to Section 503(b)(1)(B)[.]" Id. at 146. These cases clearly illustrate that, contrary to the United States' claim in this case, under federal bankruptcy law a capital gains tax is an administrative expense that cannot be charged against a secured creditor's collateral.
Rhode Island case law further supports the conclusion that the key element that distinguishes receivership expenses that may be deducted from secured collateral from general administrative expenses, is the presence of a benefit to the secured creditor. A case directly on point is South County Sand & Gravel Co., Inc. v. Bituminous Pavers Co., 108 R.I. 239, 274 A.2d 427 (1971). In that case the receivers had challenged the status of Rhode Island Hospital Trust Company, which had filed a claim as a secured creditor. Id. at 428-429. The receivers later sought to deduct the amount of their fees from Hospital Trust's collateral. Id. at 429. The Rhode Island Supreme Court denied this deduction because the receivers' actions did not benefit the secured party. The Court stated that "a judicial rule has evolved which permits receivership expenses to be taxed against encumbered property when the secured creditor or his property has been benefited or otherwise advantaged by the receivership proceedings and then only in proportion to the extent of the benefit or advantage conferred." Id. at 430. Therefore, the Rhode Island Supreme Court clearly has recognized that benefit to the secured creditor is the key element that distinguishes an expense that may be deducted from a secured creditor's collateral from a general administrative expense.
In this case, contrary to the arguments asserted by the United States, the capital gains tax conferred no benefit or advantage on either ESB or EB. Therefore, the claim cannot be paid out of the proceeds resulting from the sale of the secured creditors' collateral.
In this case, Shine paid all administrative expenses associated with the sale of the collateral, including his own fee, from the proceeds of the sales. That left no funds available to pay general administrative expenses including the capital gains tax liability. Therefore, Shine was legally justified in not paying any part of that tax liability. In short, the United States has no valid claim in this case as a matter of law.

IV. Conclusion
For the foregoing reasons, defendants' motions to dismiss the Complaint under Fed. R.Civ.P. 12(b)(6) hereby are granted. The Clerk will enter judgment for the defendants forthwith.
It is so ordered.
NOTES
[1] The United States notes that the FDIC did not provide any factual or legal explanation for its decision.